## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (SOUTHERN DIVISION)

| | |
|---|---|
| Jason Putsche, | ) |
| | ) |
| Plaintiff/Counter-Defendant | ) |
| | ) |
| v. | ) **Civil Case No. DLB 17-0255** |
| | ) |
| Alley Cat Allies, Inc., | ) |
| | ) |
| Defendant/Counter-Plaintiff | ) |
| Third Party Plaintiff | ) |
| | ) |
| v. | ) |
| Elizabeth Putsche, *et al.*, | ) |
| | ) |
| Third Party Defendants | ) |
| | ) |

## REPORT & RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636 and Local Rule 301.5(b), the Honorable Paul W. Grimm referred this matter to me to conduct an evidentiary hearing and to ultimately issue a Report and Recommendations. (ECF No. 160).[1] The referral followed the filing of a motion for partial summary judgment by Alley Cat Allies, Inc., the filing of an opposition related thereto and a cross motion for summary judgment by Jason Putsche, Elizabeth Putsche, and Jason Putsche Photography, and the filing of reply briefing. (*See* ECF Nos. 144, 150, 154, 157). The district judge held that the pleadings revealed a dispute as to the existence or validity of a settlement agreement between the parties.[2] Accordingly, the district court denied both summary judgment

---

[1] This case was reassigned to the Honorable Deborah L. Boardman following Judge Grimm's retirement.

[2] For purposes of this Report and Recommendations, I will refer to the litigants as "the parties" or, to the extent necessary, I will mention them by name.

motions, pending additional factual findings made by the undersigned after a hearing. (ECF No. 159).

For the reasons set forth herein, I ultimately recommend that the district court find that a settlement agreement exists that binds all of the parties.

## I.    GENERAL FACTUAL AND PROCEDURAL BACKGROUND[3]

Alley Cat Allies, Inc. ("ACA"), an organization dedicated to protecting and promoting the humane treatment of cats, hired Elizabeth Parowski as a communications manager to work with media and advertising to develop advocacy campaigns.  While employed at ACA, Ms. Parowski occasionally used her own camera to take photographs of cats, ACA  staff members, and various ACA-related events.

Jason Putsche, doing business as Jason Putsche Photography ("JPP"), is a photographer who took video footage of cats and photographs of people and cats ("B-Rolls" and "JPP Photographs," respectively) for ACA during the period of 2008-2014.  Ms. Parowski was the employee who brokered the contract between Mr. Putsche and ACA for him to perform photography-related work.  Years after arranging the contract with JPP/Mr. Putsche, Ms. Parowski resigned from ACA and married Mr. Putsche, taking his last name.  Subsequently, in September 2012, ACA rehired Mrs. Putsche to work as an independent contractor, whose responsibilities

---

[3] Initially, there were two federal actions involving the parties: Civ. No. 17-255 and Civ. No. 17-1197. Specifically, on January 27, 2017, Jason Putsche filed a declaratory judgment action against Alley Cat Allies, Inc. seeking declaration of copyright ownership as to photograph and raw video footage ("B-Rolls") in Case No. 17-255. Alley Cat Allies filed a counterclaim and third party complaint against Jason Putsche, Jason Putsche Photography and Elizabeth Putsche. On May 1, 2017, Jason Putsche initiated a separate copyright infringement action against Alley Cat Allies, which later became a copyright infringement and declaratory judgment action; that was Civ. No. 17-1197. On August 3, 2017, the Hon. Paul W. Grimm consolidated both cases into what is now called Civ. No. DLB 17-255. The background facts and procedural history in this Report and Recommendations document are drawn from the following: Jason Putsche's Amended Complaint, ACA's Second Amended Counterclaim/Third Party Complaint, and the docket sheets and charging documents in the state court actions initiated by Elizabeth Putsche and Jason Putsche. (*See, e.g.*, ECF Nos. 54, 62-4, 62-5, 136, 150-5).  Based on the post-hearing submissions of the parties, none of these facts appear to be in dispute. My findings of fact as to disputed issues is set forth in Section V.

included making sure that Mr. Putsche's photographs were included in a calendar that was publicly distributed by ACA.  Mrs. Putsche also occasionally took photographs of cats for ACA.

In or about late 2014, a dispute arose between ACA and the Putsches related to which party owned the rights to several thousand JPP Photographs and B-Rolls.  Another dispute  arose related to ACA's non-payment of Mr. Putsche's outstanding invoices for taking JPP Photographs and B-Rolls. Also in late 2014, Mrs. Putsche ceased working with ACA after a dispute arose related to ACA's alleged failure to pay her for services rendered.

Subsequently, in February 2015, Mrs. Putsche commenced an action against ACA in Maryland state court ("State Court Action"), alleging that ACA breached its independent contractor agreement and unjustly enriched itself by failing to pay her for her services.  ACA counterclaimed against Mrs. Putsche for breach of contract and conversion related to the B-Rolls. Neither Mr. Putsche nor JPP were parties to the State Court Action.  Bradley Stover, Esq., a partner in the law firm of Shaffer, McLaughlin and Stover, LLC represented Mrs. Putsche in the State Court Action.

On or about February 16, 2016, Mr. Putsche commenced an action against ACA in Maryland state court ("Breach of Contract Action"), alleging breach of contract, unjust enrichment and quantum meruit by failing to pay him for photographs taken as well as for rendering video edits and photoshopping services.  Mr. Stover also represented Mr. Putsche in this court action. On or about May 25, 2016, ACA and Jason Putsche settled the Breach of Contract Action for $950.00.

On May 31, 2016, ACA filed a copyright infringement suit ("Copyright Action") against Jason Putsche, JPP, Mrs. Putsche, and Mrs. Putsche's non-profit entity, Photographers for Animals, Inc. ("Putsche Parties"), in the U.S. District Court, District of New Jersey, alleging that

it owned the exclusive rights to the JPP Photographs and B-Rolls. There were three counts in the complaint: Copyright Infringement (Count I); Breach of Contract (Count II);  and Competition with Employer or Principal (Count III). [4]

On June 2, 2016, the State Court Action was scheduled for trial before the Honorable George Lipman.  Ultimately, trial did not occur because a settlement agreement ("June 2 Settlement Agreement") was read into the record before Judge Lipman.  Thus, Judge Lipman closed the case.

Thereafter, on or about August 3, 2016, Mr. Stover ceased representing Elizabeth Putsche. On August 16, 2016, Elizabeth Putsche, through new counsel Katherine Goldman, filed a motion to set aside the June 2 Settlement Agreement.  ACA opposed, and filed a motion to enforce the agreement.  On October 19, 2016, Judge Lipman issued a memorandum opinion and order denying the motion.  The record reflects that Elizabeth Putsche did not appeal Judge Lipman's decision.

On January 3, 2017, the Copyright Action was dismissed without prejudice.  On January 27, 2017, Mr. Putsche sued ACA in this court, alleging that he had copyright ownership over the JPP Photographs and B-Rolls.  ACA filed a counterclaim and third party complaint against Jason Putsche, Elizabeth Putsche, and JPP, alleging that the Putsches breached the June 2 Settlement Agreement.

For brevity's sake, I generally note that the district court issued orders resolving cross motions to dismiss all of the claims and addressing a subsequent motion to dismiss filed by ACA. (ECF Nos. 66, 133).   The operative complaints are: (1) Jason Putsche's Amended Complaint against ACA (Count I is a copyright infringement claim and Count II is a declaratory judgment claim)("Amended Complaint"); and (2) ACA's Second Amended Counterclaim/Third Party

---

[4] An Amended Complaint was filed on June 2, 2016, which is virtually identical to the original Complaint.

Complaint (Count I: Breach of Settlement Agreement, against the Putsches; Count III: Promissory/Equitable Estoppel, against JPP and Mr. Putsche; and Count VII: Copyright Infringement, against the Putsches).  (ECF Nos. 54, 136; Joint Ex. 49).

ACA filed a motion for partial summary judgment as to Counts I and II of the Amended Complaint, and as to Count I of its Second Amended Counterclaim/Third Party Complaint.  (ECF No. 144).  In brief, ACA avers that a binding and enforceable settlement agreement exists between it and the Putsche Parties that resolves the State Court Action and all disputes related to photographs taken by the Putsches.  Thus, consistent with the doctrines of *res judicata* and collateral estoppel, Mr. Putsche's copyright and declaratory judgment claims should be dismissed, and ACA is entitled to judgment on its claim that the Putsches are in breach of the June 2 Settlement Agreement.  Alternatively, even if *res judicata* and collateral estoppel do not apply, Mr. Putsche knowingly and voluntarily entered into the June 2 Settlement Agreement.  (*Id.*).

The Putsche Parties filed an opposition to ACA's motion for partial summary judgment and a cross motion for partial summary judgment.  (ECF No. 150).  In brief, the Putsche Parties allege that ACA's collateral estoppel and *res judicata* arguments lack merit as the State Court Action did not involve Mr. Putsche.  In addition, as is relevant for the referral to me, the Putsches advanced the following arguments.  First, that Mr. Stover was not Mr. Putsche's attorney on June 2, 2016.  Thus, Mr. Putsche did not authorize him to discuss or reach an agreement related to the JPP photographs and B-Rolls.  Second, to the extent that a settlement agreement was reached that day, Mr. Putsche did not act in a way that manifested his assent to it.  Third, and alternatively, the June 2 Settlement Agreement is unenforceable because it is indefinite, as there is a failure of mutual assent on an essential term, i.e., how to define the universe of "remaining photos."  Thus, even though Mrs. Putsche has admitted that she is bound by the terms of the agreement read into

the record during the June 2, 2016 proceedings, she is only bound to the extent that the agreement is enforceable.  Fourth, the agreement reached reflects that the "remaining photos" issue would be subject to non-binding mediation.  Fifth, assuming that the Putsches did agree to the terms set forth Jason Oravetz's handwritten notes, because there are differences between the notes and what was read into the record on June 2, 2016, there was no meeting of the minds  between the parties.

The district court denied both motions and made the referral to the undersigned.

## II.   EVIDENCE

This matter was referred to me conduct an evidentiary hearing and make factual findings about whether a settlement existed between ACA and the Putsches.  Specifically, my charge was to determine: (1) whether Mr. Stover had the authority to enter into a settlement agreement on behalf of Plaintiff/Counter-Defendant Jason Putsche and Third Party Defendant Jason Putsche Photography; (2) whether an agreement exists that resolved the contract and copyright-related disputes between the parties (global agreement), and, if so, what its terms; and (3) if a global settlement exists, who is bound by the that agreement.

I conducted an evidentiary hearing, during which Elizabeth Putsche, Jason Putsche, and Bradley Stover testified.  (ECF No. 189).  The parties sponsored joint exhibits, which were admitted at the hearing.  (ECF No. 186).

To prepare this Report and Recommendation,  I have reviewed the transcript of the hearing:

- Testimony of Elizabeth Putsche (ECF No. 189, pp. 10-127, "EP Hearing Transcript")

- Testimony of Jason Putsche (ECF No. 189, pp. 128-202, "JP Hearing Transcript")

- Testimony of Bradley R. Stover (ECF No. 189, pp. 204-297, "BRS Hearing Transcript")

I have also reviewed the exhibits admitted at the hearing:

- Joint Ex. 1 - February 12, 2019 Deposition Transcript of Bradley R. Stover, Esq.

- Joint Ex. 3 - October 2014 Engagement Agreement: Jason Putsche and Shaffer, McLaughlin & Stover, LLC

- Joint Ex. 6 - February 11, 2015 Complaint, Elizabeth Putsche v. ACA, District Court of Maryland, Baltimore City

- Joint Ex. 8 - Shaffer, McLaughlin & Stover, LLC Invoices: May 2016-Aug. 2016

- Joint Ex. 9 - March 1, 2016 email chain, RE: Putsche v. ACA

- Joint Ex. 10 - March 10, 2016 email chain, RE: Putsche v. ACA

- Joint Ex. 11 - May 25, 2016 email, RE: Putsche v. ACA

- Joint Ex. 13 - May 31, 2016 email chain, RE: Putsche/ACA

- Joint Ex. 14 - October 19, 2016 Memorandum Opinion/Order and Transcript of June 2, 2016 Settlement Agreement

- Joint Ex. 16 - Handwritten Notes Generated on June 2, 2016 by Jason Oravetz, Esq.

- Joint Ex. 17 - July 28, 2016 email, Status

- Joint Ex. 18 - November 6, 2015 email, Putsches Settlement Agreement with attached Settlement Agreement and General Release

- Joint Ex. 19 - November 11, 2015 email chain, RE: Putsches Settlement Agreement

- Joint Ex. 21 - March 2, 2016 email chain, RE: Putsche v. ACA

- Joint Ex. 22 - March 10, 2016 email chain, RE: Putsche v. ACA

- Joint Ex. 25 - May 23, 2016 email, Putsche v. ACA, with attached complaint from Copyright Action

- Joint Ex. 26 - May 25, 2016 Letter with check for Jason Putsche Photography

- Joint Ex. 27 - January 22, 2019 Deposition Transcript of Jason Putsche, with errata sheet

- Joint Ex. 29 - January 22, 2019 Deposition Transcript of Elizabeth Putsche, with errata sheet

- Joint Ex. 31 - August 18, 2016 Motion to Set Aside Settlement and Reopen the Action, District Court of Maryland, Baltimore City, with transcript of June 2, 2016 hearing attached

- Joint Ex. 32 - May 25, 2016 email chain, RE: Copyright attorney

- Joint Ex. 33 - May 27, 2016 email chain, RE: $

- Joint Ex. 35 - July 5, 2016 email chain, RE: Community Cat Photography by Jason Putsche Photography

- Joint Ex. 36 - February 15, 2015 Elizabeth Putsche Assignment of Rights in Photos

- Joint Ex. 38 - July 11, 2016 email, RE: ACA, with attached Settlement Agreement

- Joint Ex. 39 - July 14, 2016 email, RE: ACA and Settlement Agreement

- Joint Ex. 43 - Audio Recording of June 2, 2016 Hearing, District Court of Maryland, Baltimore City

- Joint Ex. 44 - Transcript of June 2, 2016 Hearing, District Court of Maryland, Baltimore City

- Joint Ex. 45 - Amended Complaint, ACA v. Putsche, et al, U.S. District Court, District of New Jersey

- Joint Ex. 48 - January 31, 2017 Demand Letter to Justin Oravetz with Jason Putsche's Complaint for Declaratory Judgment attached (PWG 17-255)

- Joint Ex. 49 - First Amended Complaint, Putsche v. Alley Cat Allies (TDC 17-1197)

- Joint Ex. 55 - January 7, 2015 email, RE: how's this?

- Joint Ex. 56 - July 14, 2015 email, Putsche v. Alley Cat Allies

- Joint Ex. 58 - June 1, 2016 email chain, FW: ACA v. Putsche, et al

- Joint Ex. 60 - June 1, 2016 email chain, RE: ACA v. Putsche, et al

- Joint Ex. 61 - July 27, 2016 email chain, RE: I just listened to the court audio file for the settlement

- Joint Ex. 63 - August 4, 2016 email chain, RE: 20925f55

- Defendant's Impeachment Exhibit 3- November 18, 2016 Letter from Kathryn Goldman to Justin Oravetz

Moreover, I reviewed the docket sheet and operative pleadings and the exhibits attached to the parties' summary judgment pleadings, which are largely duplicative of the exhibits admitted at the hearing.  (*See* ECF Nos. 144, 150, 154, 157, and exhibits attached thereto).

No one introduced into evidence the following documents, which I reviewed and find helpful to my analysis:

- September 21, 2018 Letter to Hon. Paul W. Grimm (ECF No. 144-4)

- February 16, 2016 Complaint, Jason Putsche v. ACA, District Court of Maryland, Baltimore City (ECF No. 150-5, pp.2-8)

- March 22, 2019 Affidavit of Jason Putsche (ECF No. 150-7)

- March 22, 2019 Affidavit of Elizabeth Putsche (ECF No. 150-18)

- July 7, 2016 email chain, RE: ACA (ECF No. 150-20)

- December 29, 2016, Letter from Justin Oravetz to Katherine Goldman, re: ACA's spreadsheets (ECF No. 150-25)

Furthermore, I reviewed the pre- and post-hearing briefing from the parties and the exhibits related thereto.  (ECF Nos.  167, 171, 171-1, 171-2, 171-3, 190, 191).  I have also relied upon them in my recommendations.

## III.   LEGAL STANDARDS

### A.  CONTRACT LAW

In Maryland, the elements of a contract are: (1) offer and acceptance (mutual assent); (2) an agreement that has definite terms; and (3) consideration.  *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 777 (4th Cir. 2013); *see also* Maryland Civil Pattern Jury Instructions, MPJI-Cv-9:2 (5th ed., 2018; 2022 Replacement Pages)(elements of a contract: two or more parties; parties with

legal capacity to make the agreement; mutual agreement; agreement must be stated with reasonable certainty; and there must be consideration for the agreement).

    1.   *Offer and Acceptance (Mutual Assent)*

A contract is to be "construed in its entirety and, if reasonably possible, effect must be given to each clause," interpreting it in a way that gives meaning to all parts of the contract. *Cochran v. Norkunas*, 398 Md. 1, 17, 919 A.2d 700 (2007).

"Assent" may be "made wholly or partly by written or spoken words or by other acts or by failure to act." *NeighborCare Pharmacy Servs., Inc. v. Sunrise Healthcare Ctr. Inc.,* JFM 05-1549, 2005 WL 3481346, at *2 (D. Md. Dec. 20, 2005)(quoting 17A Am. Jur. 2d Contracts, § 34 (2004)).  Mutual assent is determined by examining whether the parties intended to be bound by the agreement and the definiteness of terms used. *Falls Garden Condo. Assoc., Inc. v. Falls Homeowners Assoc., Inc.*, 441 Md. 290, 107 A.3d 1183, 1189 (2015); *see also Houston v. Monumental Radio, Inc.*, 158 Md. 292, 148 A. 536 (1930) ("Mutuality of assent" amongst the parties requires "a meeting of the minds on all contract terms, or an agreement on how to determine terms not agreed upon"); Maryland Civil Pattern Jury Instructions, MPJI-Cv-9:10 (5th ed., 2018; 2022 Replacement Pages)(parties must agree to be bound by terms and conditions of contract).

As is relevant here, an oral contract "must express with certainly the nature and extent of the parties' obligations and the essential terms of the agreement." *Faddis Concrete, Inc. v. Brawner Builders, Inc.*, Civ. No. ELH 15-3975, 2017 WL 4098739, at *5 (D. Md. Sept. 15, 2017)(citing *Cnty. Comm'rs for Carroll Cty v.Forty W.Builders, Inc.*, 178 Md. App. 328, 377-78, 941 A.2d 1181, 1209-10 (2008)).

When interpreting a contract, a court is to "give effect to the parties' intentions." *Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37,51, 73 A.3d 224, 232

(2013)(citation omitted).  To determine whether the parties to an agreement intended to be bound by it, the test  is an objective one, whereby a court analyzes "what a reasonably prudent person in the parties' position would have understood to be the meaning of  agreement."  *Cochran, supra*, 398 Md. at 17; *see also Ocean Petroleum Co. v. Yanek*, 416 Md. 74, 5 A.3d 683 (2010)(unambiguous contract is what a reasonable person in the parties' positions would have thought the contract meant).

2.   *Terms of the Agreement*

Regarding the contract's terms, the "parties must express themselves in such terms that it can be ascertained to a reasonable degree of certainty what they mean."  *Robinson v.* Gardiner, 196 Md. 213, 217, 76 A.2d 354, 356 (1950).

A contract that contains indefinite or uncertain terms may render the agreement invalid. *Falls Grove Condo*, *supra*, 107 A.3d at 1191.

A contract is considered ambiguous if, to a reasonable person, the language or words used are susceptible to more than one meaning.  *Ashton*, *supra*, 354 Md. at 341.  To determine whether a contract is susceptible to more than one meaning, a court is to consider "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of the execution." *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486 (1985).  If there is an ambiguity in a contract, that's when you can look at "other permissible aids" to contract construction.  The court "may consider evidence of such extrinsic factors as the negotiations of the parties, the circumstances surrounding execution of the contract, the parties' own construction of the contract and the conduct of the parties."  *Della Ratta, Inc. v. American Better Community Developers, Inc.*, 38 Md. App. 119, 130, 380 A.2d 672, 635 (1977); *see also Miller v. Bristol-Myers Squibb Co.*, 121 F.Supp. 2d 831, 84 (D. Md. 2000).

Finally, the fact that a party has "second thoughts" about a contract "does not render the agreement unenforceable." *Hensley v. Alcon Labs, Inc.*, 277 F.3d 535, 540 (4th Cir. 2002).

3. *Consideration*

The last requirement for a binding contact is consideration. Consideration is defined as "anything of value" to a party. Maryland Civil Pattern Jury Instructions, MPJI-Cv-9:9 (5th ed., 2018; 2022 Replacement Pages).

**B. ATTORNEY REPRESENTATION**

Whether or not Mr. Stover had the authority to settle all claims is a question of fact. *Scamardella v. Illiano*, 126 Md. App. 76, 84, 727 A.2d 421 (1999). In Maryland, the relationship between an attorney and his client "is generally one of agency." *In re: Alijah Q.*, 195 Md. App. 491, 520, 7 A.3d 106 (2010). In addition, a Maryland attorney has the "authority to bind his client by his actions related to the conduct of litigation." *Mitchell Props. v. Real Estate Title Co.*, 62 Md. App. 473, 484, 490 A.2d 271 (1985)(quoting *Kincaid v. Cessna*, 49 Md. App. 18, 22, 430 A.2d 88 (1981)). This authority does not extend to settlement, rather, an attorney must have the express authority to settle a client's case. *Accrococco v. Splawn*, 264 Md. 527, 533, 287 A.2d 275 (1972).[5]

A court can find that an attorney had the actual authority to settle a case if the client's "written or spoken words or other conduct" can be reasonably interpreted by the attorney to believe that his client authorizes him to act on the client's behalf. *See generally Dickerson v. Longoria*, 414 Md. 419, 442, 995 A.2d 721 (2010); *see also Citizens Bank of Md. v. Md. Indus. Finishing Co.*, 338 Md. 448, 459, 659 A.2d 313 (1995).

---

[5] The party who seeks to enforce a settlement based on an attorney's actions bears the burden of establishing that the attorney acted with his client's authority, and that authority expressly extended to the settlement of the claim. *Mitchell Props.*, 62 Md. App. at 483.

ACA alleges that Mr. Stover had the authority from Mr. & Mrs. Putsche to negotiate a settlement agreement on their behalf, which they both assented to voluntarily.  Thus, a valid settlement agreement exists that the district court must enforce.  Under this circumstance, the burden rests with ACA to establish that Mr. Stover acted consistent with the authority conferred by his clients, which included the ability to settle the claim.  *4900 Park Heights Avenue, LLC v. Cromwell Retail, LLC*, 246 Md. App. 1, 23-24, 227 A.3d 757, 768, *cert. denied*, 469 Md. 655 (2020).

### C. CREDIBILITY FINDINGS

A judge tasked with finding the facts has the "inherent right to disregard [the] testimony of any witness" if the factfinding judge is satisfied that "the witness is not telling the truth, or the [witness'] testimony  is inherently improbable due to inaccuracy, uncertainty, interest or bias." *Select Auto Imports Incorporated v. Yates Select Auto Sales, LLC*, 195 F. Supp.3d 818, 823 (E.D. Va. July 2016)(citing *Penn Texas Corp. v. Morse*, 242 F.2d 243, 147 (7th Cir. 1957)); *see also Columbus-Am. Discovery Grp. v. Alt. Mut. Ins. Co.*, 56 F.3d 556, 567 (4th Cir. 1995)(fact finder in better position to evaluate how reliable evidence is, "including evaluation of credibility of witnesses"); *Burgess v. Farrell Lines, Inc.*, 335 F.2d 885, 889 (4th Cir. 1964)(judge presiding over bench trial has opportunity to observe the demeanor and attitude of testifying witnesses and has the duty to "weigh and appraise all of the conflicting testimony").

When analyzing whether to believe a witness, the court evaluates whether the witness may benefit in some way from the outcome of the case, which could create a motive to testify falsely and may sway a witness to testify in a way that advances his own interest.  *See generally Davis v. Alaska,* 415 U.S. 308, 316 (1974).

## IV.    THE PARTIES' ARGUMENTS RELATED TO CERTAIN FACTS

### A.  ALLEY CAT ALLIES' ARGUMENTS

Over the life of this case, ACA's arguments have remained relatively consistent when trying to establish that the June 2, 2016 Settlement Agreement was valid.  There is, however, at least one argument that is not supported by the evidence.  This gave me pause and led me to scrutinize ACA's factual assertions more carefully.

In its Second Amended Counterclaim and Third Party Complaint, ACA takes the position that in July 2016 former counsel drafted and sent to Mr. Stover a written settlement agreement that "reflected the parties' settlement on June 2, 2016."  (ECF No. 136, ¶¶ 53, 54).  This written agreement was forwarded to Mr. Stover on or about July 11, 2016.  (Joint Ex. 38).  I do not find this to be true.  The written document contained some terms not reflected in the notes taken on June 2, 2016 or in the transcript of the agreement reached that were read into the record on June 2, 2016.  For instance, neither the notes nor the transcript reflect that the cap on the maximum number of remaining photos that ACA was entitled to following the draft procedure was 33%; instead, they reflect that it was 25%.  (Joint Exs. 16, 44).  In addition, neither of these documents reflect that ACA's $18,000 payment to Mrs. Putsche was due after mediation and Copyright Action were resolved.  (*Id.*).

### B.  THE PUTSCHES' ARGUMENTS

There have been three attorneys at different law firms who have represented one and/or both of the Putsches in connection with their disputes involving ACA.  (Joint Exs. 1, 27, 29, 31; ECF No. 144-4).  During the life of all of this litigation, some of the arguments made by the Putsches have changed.  This gave me pause. It led me to question the credibility of the Putsches'

deposition and evidentiary hearing testimony when they testified about what they were supposedly thinking back on June 2, 2016..[6]

Here are two examples.

On September 21, 2018, the argument was made that Mrs. Putsche did not dispute that Mr. Stover was her attorney "and that the settlement read into the record on June 2, 2016 is binding as to her, individually. She does, however, contend that she misunderstood some of the terms and that some of the terms are ambiguous and open to interpretation. But again, she does not dispute that she is **personally bound by all of them**."  (ECF No. 144-4) (emphasis supplied).  By March 2019, that position had changed a bit.  On March 22, 2019, the Putsches opposed ACA's motion for summary judgment and filed a cross motion for summary judgment.  In that pleading, an argument was made that Mrs. Putsche agreed to be bound by the June 2, 2016 settlement agreement "to the extent that it is enforceable."  (ECF No. 150).

In August 2016, the argument was made that the June 2, 2016 "settlement that was reached in the hallway of the courthouse or that [was] read into the record did not include Jason Putsche, JPP or [Mrs. Putsche's non-profit entity]."  This was because "none of [those] parties was present in the courtroom when the settlement was read into the record."  (Joint Ex. 31).  By September 2018, and definitely by January 2019, the argument had evolved to include an assertion that Mr. Stover was neither Mr. Putsche's nor JPP's attorney on June 2, 2016, and that he was not authorized to reach an agreement related to JPP photographs and B-Rolls.  (ECF No. 144-4; Joint Ex. 27).

---

[6]As set forth below in Section V., I ultimately concluded that after June 2, 2016, the Putsches appear to have engaged in a steady effort to try to undue the settlement agreement that they know was reached.

## V.     FINDINGS OF FACT

### A.  SUMMARY OF FINDINGS

I analyzed the evidence, construed the agreement in its entirety, gave effect to the parties' intentions, and draw reasonable inferences therefrom.  *Cochran*, *supra*, 398 Md. at 17; *Dumbarton Imp. Ass'n, Inc.*, *supra*, 434 Md. at 51.  I find that all of the parties believed that they reached an agreement on June 2, 2016 with the aim of resolving the State Court Action and the disputes about who had the copyrights to all of the photographs taken by Jason Putsche/JPP and Elizabeth Putsche.  The parties expressed themselves in such a way that I could ascertain with a reasonable degree of certainty what they meant.  *Robinson*, *supra*, 196 Md. at 217.  As set forth in more detail herein, the exhibits upon which I primarily rely to make these findings include: Joint Exs. 1, 16, 17, 27, 29, 35, 39, 43, 44, 61; ECF No. 150-20; Defendant's Impeachment Ex. 3; and BRS Hearing Transcript.

I also find, based on my review of the credible evidence and drawing reasonable inferences therefrom, that when the settlement agreement was read into the record on June 2, 2016, the parties did not appear to be concerned about defining with exactitude what would constitute "remaining photographs," agreeing instead that all issues related to this batch of photographs would be resolved in mediation.  If a dispute arose as to what the batch was, and also what was, e.g., a headshot or a honeymoon photo, the parties agreed that they would resolve that dispute at mediation with the assistance of the mediator.  (Joint Exs. 43, 44, 48, 61; ECF No 150-20).  In addition, the parties agreed that the mediator would decide the cap or the maximum number of photographs that ACA could select.  (Joint Exs. 16, 43, 44).  The record reflects that there is a meeting of the minds.

There is no credible evidence before me that on June 2, 2016, the parties thought that it was impossible to define what "remaining photos" were.  All of their discussions before June 2, 2016 involved images taken by JPP and Mrs. Putsche during the time that ACA and JPP/Mr. Putsche had a relationship.  (*See, e.g.*, Joint Exs. 9, 10, 11,13, 18, 19, 21, 22, 25, 58).  In addition, the non-redacted portions of the Copyright Action complaint provided to the Putsches on or about June 1, 2016 describe the photographs at issue, including those taken during photo shoots, photographs from the JPP website that contained photographs, copyrighted photos. (Joint Exs. 25, 58).  In addition, if you exclude honeymoon photographs and headshots with ACA personnel, you are left with a universe of photographs taken during the ACA/JPP relationship.  Accordingly, I do not find that the parties believed on June 2, 2016 that "remaining photos" was an indefinite or ambiguous term.

Assuming, alternatively, that "remaining photos" could have been perceived as ambiguous, when I examined the negotiations of the parties, circumstances before June 2, 2016, and the conduct of the parties on June 2, 2016, it leads me to reasonably conclude that on June 2, 2016 the parties did not believe that "remaining photos" could not be defined.  *Della Ratta, Inc.*, *supra*, 38 Md. App. at 130.

Again, I do not think that on June 2, 2016 the parties thought that the term "remaining photos" was ambiguous.  Despite this finding, I do not find that the Putsches explicitly agreed that the mediator would resolve any dispute about "remaining photos" without their input.  Nor do I find that the Putsches explicitly agreed that the mediator would have the final word on how to resolve such a dispute.  This settlement term is not in the notes, nor in the interactions between the parties before June 2, 2016.  (Joint Exs. 9-11,13, 16, 18, 19, 21, 22, 25).  Reviewing the evidence and drawing a reasonable inference therefrom, I find that Mr. Oravetz only suggested this term

after Mrs. Putsche asked Mr. Stover about it during the June 2, 2016 proceedings.  (Joint Ex. 44).
This leads me to conclude that it was not discussed during the hallway negotiations, which is why
Mr. Stover said this to the Putsches in July 2016.  (Joint Exs. 39, 43, 44).  Thus, I cannot find that
there was a meeting of the minds that if during mediation if such a dispute arose that could not be
resolved, the mediator had the final word.

Despite this, as I have held above, I find that the evidence supports the inference that if
such a dispute did arise, the parties agreed that they would exercise best efforts to resolve that
dispute at mediation with the assistance of the mediator.  In sum, the evidence supports that they
agreed to leave issues related to the remaining photographs to mediation and hoped that it would
work out.  (ECF No. 150-20; Joint Exs. 43, 44, 48, 61).

Moreover, I do not think that, on June 2, 2016, anyone was focused on the date that Mrs.
Putsche would be paid $18,000.  Nor do I believe Mrs. Putsche's statements that being paid within
30 days of June 2 was on her mind on June 2, 2016.  I find that the idea that payment should occur
no later than 30 days after June 2 came from Mr. Stover, who believed that this was a standard
condition.  (Joint Exs. 16, 44, 35, 39, 61).  I further find that after Mr. Stover suggested this, Mrs.
Putsche started to think about non-payment within thirty days of June 2, 2016 as a possible breach
of the June 2 agreement.  (Joint Ex. 61).

Reviewing all of the evidence and drawing a reasonable inference therefrom, I further find
that on June 2, 2016, the parties intended to be bound by the agreement, i.e., they wanted to be
done with each other after mediation.  All parties hoped that mediation would enable them to part
ways once and for all.  That is why they were willing to dismiss claims with prejudice after
mediation.  This is why ACA ceased prosecuting the Copyright Action in January 2017.  This is
why Mrs. Putsche accepted the $18,000 payment and started performing on the contract by

18

supplying a list of JPP Photographs and images of her photographs to ACA.  There is simply no credible evidence that the Putsches in 2016 thought that the mediation was non-binding as to either or both of the Putsches.  I do not credit Mrs. Putsche's testimony that she could accept ACA's payment of $18,000 and attend non-binding mediation to discuss only her photographs, (*see, e.g.,* Joint Ex. 31).  First, Mrs. Putsche transferred her rights/ownership of her photographs to her husband in 2015.  (Joint Ex. 36).  Second, Mrs. Putsche's interpretation is of a unilateral arrangement not borne out by the facts, and is an arrangement under which ACA would receive no consideration for its promise to dismiss the Copyright Action.  ACA would pay her $18,000 but receive nothing in return: no ability to avoid future litigation; no final resolution of all copyright disputes.

I further find, based on my review of the evidence and drawing reasonable inferences therefrom, that Jason Putsche and Elizabeth Putsche believed that an agreement had been reached on June 2, 2016 to which they were bound.  However, they seemed to regret their decision.  (Joint Ex. 39, ECF No. 150-20).  Their second thoughts about what they had done does not render this agreement invalid.  *Hensley, supra*, 277 F.3d at 540.  The Putsches undertook efforts to try to get out from under that agreement, including claiming that there was no meeting of the minds and that Mr. Stover was not authorized to act on Mr. Putsche's behalf.  A very similar suggested line of attack was suggested by their former attorney, Bradley Stover.  (Joint Ex. 17).  I do not find it to be a coincidence that the Putsches' statements and testimony after June 2, 2016 are consistent with the execution of this strategy.  Because of this fact, I viewed the Putsches' testimony through this lens.

No credible evidence was before me that between on or about June 2, 2016 and June 28, 2016 the Putsches were concerned that the terms of the agreement were vague, ambiguous or

unenforceable as to either or both of them.  On or about July 11, 2016, after the Putsches received

the draft written agreement from ACA, the majority of their *post facto* subjective statements about

what they claim they understood on June 2, 2016 started to occur.  (*See, e.g.*, Joint Exs. 1, 35, 39,

61, 63; ECF No. 150-20; and BRS Hearing Transcript).  This was one factor that made me question

the Putsches' credibility.

Between in or about November 2016 - January 2017, the evidence supports my finding that

the Putsches knew that they were bound by the settlement agreement.  Mrs. Putsche did not appeal

Judge Lipman's order denying the motion to set aside the agreement.  (EP Hearing Transcript, p.

121)(the June 2, 2016 settlement, "as clarified and confirmed by [Judge Lipman's order]" was

binding as to her).  The parties acted in conformance with the agreement that they reached.  ACA

paid Mrs. Putsche $18,000, both parties exchanged lists of "remaining photos."  The Putsches had

excluded from their submission honeymoon photos and headshot photos without cats because

Judge Lipman's October 19, 2016 order set forth the parties' agreement that such photos belonged

to Elizabeth Putsche and ACA, respectively.  (Joint Ex. 14).  ACA ceased its Copyright Action

litigation.  (Joint Ex. 29, BRS Hearing Transcript, Defendant's Impeachment Ex. 3, and ECF No.

150-25).

### B.  CREDIBILITY FINDINGS

At the evidentiary hearing, I had the opportunity to observe Mr. Stover's demeanor during

direct examination and cross examination.  In brief, I found him credible.  I do not find that there

were any material inconsistencies between his February 2019 deposition testimony and his hearing

testimony.  I do not find that he was impeached on any material facts during his deposition.

However, I do find that he has been inconsistent on one issue of significance.  On July 11,

2016, ACA emailed to Mr. Stover a written draft settlement agreement, which contained language

that if ACA and the Putsches could not come to an agreement on the total number of honeymoon photos, head shot photos or the total number of "remaining photos," the mediator would make the decision, which would be binding as to them all. (Joint Ex. 38). On July 11, 2016, Mr. Stover emailed the Putsches and agreed that this was not a term that was part of the agreement, but he liked that idea. (Joint Ex. 39). In contrast, during the evidentiary hearing, Mr. Stover testified that his clients agreed that the mediator would be empowered to make the final decision if a dispute arose about the photographs. (BRS Hearing Transcript, p. 256). The evidence read into the record from June 2, 2016 is that the mediator would have such power. (Joint Ex. 43; Joint Ex. 44, p. 10). But, as I found above in Section V.A., I do not find that the parties agreed to this term.

Other than this issue, overall, I did not find his testimony to be evasive or non-responsive on any issues material to my determination. (Joint Ex. 1; BRS Hearing Transcript, pp. 204-297). I further note that Mr. Stover is the only person who testified who does not have an interest in the outcome of this case. Thus, I did not find reason to disregard or discredit material aspects of his testimony. *Select Auto Imports*, *supra*, 195 F.Supp. 3d at 818.

At the evidentiary hearing, I also had the opportunity to observe Mr. Putsche and Mrs. Putsche while they testified. I viewed each person's demeanor during direct examination and cross examination. I observed their facial expressions and body language while they testified.

Based on my review of all of the documentary and testimonial evidence, and of their demeanor at the hearing and their conflicting and contradictory testimony, I do not find the Putsches were consistently credible. I do not find them to be reliable witnesses. Rather, I find self-serving several aspects of their statements and testimony. Thus, it would have been proper to disregard their testimony. *Select Auto Imports*, *supra*, 195 F.Supp. 3d at 818. However, I did not do that.

21

Because of the questions that I have about the credibility of Mr. and Mrs. Putsche as set forth below, I was reluctant to rely upon the Putsches' statements made in 2019 or later about what they said that they were thinking on June 2, 2016 if there was no evidence to corroborate their 2019 or 2021 testimony.  I scrutinized their statements and could not ignore their changing narratives, and that they had an interest in the outcome of the case.

Immediately below are just a few examples of their statements or conduct over the life of this case that have caused me to question their credibility.  More examples are found in the other parts of Section V.

1. *Jason Putsche*

    a. Bradley Stover's Representation of Jason Putsche

Jason Putsche argues that after he resolved his Breach of Contract Action he believed that Mr. Stover no longer represented him regarding anything "related to ACA."  To support this argument, he says that he never executed a new engagement letter that would "continue" Mr. Stover's representation related to any further disputes with ACA.  He also argues that there are no invoices that contain entries reflecting discussions with Mr. Stover or any advice rendered.  (Joint Ex. 27, JP Hearing Transcript).  I do not find these statements and the facts from 2016 are more reliable.

The record establishes that on or about May 26, 2016, Mr. Putsche received the $950.00 check in resolution of the Breach of Contract Action.  (Joint Exs. 26; 27, pp. 15-16, 46; 33).  According to Mr. Putsche, then, after that payment Mr. Stover would no longer be his attorney after that date.

However, Mr. Putsche's 2016 conduct--well before his 2017 lawsuit was filed in this court--tells a different story.  On May 23, 2016, Justin Oravetz notified Mr. Stover that ACA was

planning on filing the Copyright Action if the "parties could not settle their differences," which Mr. Stover communicated with the Putsches about on May 25, 2016.  Their email communications reflect strategy discussions about: possible terms to resolve the State Court Action and who owns all photographs and the B-Rolls; how to handle the possible Copyright Action, including whether to hire Kathryn Goldman as counsel; and whether Jason Putsche or JPP had an insurance policy to cover the attorney's fees for defending against the Copyright Action.  (Joint Exs. 11, 25, 32, 33; Joint Ex. 1, pp. 28-42; Joint Ex. 27, pp. 26-27, 45-61; Joint Ex. 29, pp. 70-79).  On or about May 27, 2016, Mr. Putsche emailed Mr. Stover to get legal advice about the scope of his insurance coverage and whether it could help defray costs associated with the Copyright Action.  Mr. Putsche said that he would discuss with Mr. Stover the following Tuesday, which would have been May 31, 2016.  (Joint Ex. 33).  On May 31, 2016, the two of them discussed the insurance policy.  (Joint Ex. 27).

Next, on June 2, 2016, Mr. Putsche participated in hallway conversations with Mr. Stover and his wife about the JPP photographs.  Mr. Putsche has testified that he told Mr. Stover on June 2, 2016 that he did not want a settlement involving the JPP photographs.  (Joint Ex. 27, JP Hearing Transcript).

Neither his deposition nor hearing transcript reflects that he told Mr. Stover on June 2, 2016 that the attorney was not authorized to negotiate or settle any dispute related to JPP photographs.  (Joint Ex. 27, JP Hearing Transcript).  Neither of these transcripts contains testimony from Mr. Putsche that he said to Mr. Stover on June 2, 2016 words to the effect of "Why are you discussing my photographs with ACA? You don't represent me anymore. You are not authorized to discuss the photographs."  The absence of words such as these leads me to draw the reasonable inference that Mr. Putsche thought that Mr. Stover still represented him on June 2, 2016.

In addition, on June 2, 2016, hours after the settlement agreement was read into record, Mr. and Mrs. Putsche contacted Mr. Stover to discuss the settlement, including arguing that Mr. Putsche could not be bound by the agreement and how Mrs. Putsche did not agree to all of the terms read into the record. (Joint Exs. 1, p. 11; 27, p. 44; 29, pp. 136-141). On July 7, 2016, Jason Putsche contacted Bradley Stover to follow up on an email from Mr. Stover that summarized a recent conversation that the three of them had about the June 2, 2016 settlement. (ECF No. 150-20). Finally, in August 2016, Mr. Putsche sent an email his insurance representative in which he said that Kathryn Goldman is now representing the Putsches. (Joint Ex. 63).

No email from 2016 has been entered in the record establishing that Mr. Putsche told Mr. Stover that he did not want Stover to continue to represent him in any in capacity during the period of May 2016 - August 2016. Analyzing all of the foregoing evidence, I find him incredible when he claims that he did not believe that Mr. Stover was his attorney after May 27, 2016.

### b. Attempts to Change Deposition Testimony

I find troubling that Mr. Putsche has attempted to substantively change his deposition testimony, which was made under oath, by subsequently executing an errata sheet and an affidavit. Mr. Putsche was deposed on January 22, 2019. Approximately one month after his deposition, on February 28, 2019, he signed an errata sheet in which he attempted to make six substantive changes to his deposition testimony. (Joint Ex. 27, Errata Sheet for Deposition Transcript). These changes are likely impermissible.[7]

---

[7] While it is true that the Fourth Circuit has not yet opined on whether under Fed.R.Civ.P.30(e)(1) a deponent should be allowed to make substantive changes or only minor changes (e.g., typographical error) to his deposition transcript, there is a trend against allowing substantive changes. Under this view, an errata sheet that makes substantive changes to a deponent's testimony--for instance, to ameliorate contradictions between testimony, provide additional or different information, or augment testimony--are impermissible, as they exceed what is allowed for changes to deposition testimony. What is usually permissible are changes due to transcriptional/typographical errors made by a court reporter. *See E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 277 F.R.D. 286, 288-89 (E.D. Va.

Even if such changes are permissible, that fact, combined with the fact that Mr. Putsche also attempts to alter or "correct" his deposition testimony again with an affidavit, made me question how much I could rely on his testimony. The documents reflect that on March 22, 2019, roughly two months after his deposition--and 21 days after ACA filed its motion for partial summary judgment--Mr. Putsche executed an affidavit in which he attempted to provide more self-serving testimony. (ECF No. 150-7). It made me wonder why Mr. Putsche was not able to correct his answers during his deposition, as opposed to making them twice, after having had the opportunity to review the transcript, possibly talk to his attorney and look at ACA's summary judgment pleading and reflect on the possible adverse inferences that could be drawn from the answers that he gave during his deposition. Rather than make himself appear more credible, these actions led me to question the veracity of his testimony under oath at the deposition and at the hearing.

2. *Elizabeth Putsche*

I do not find her credible when she says that in her mind on June 2, 2106 was the idea that she wanted to be paid $18,000 within 30 days. What was material to her was that she got paid. The 2016 evidence does not support that this was her idea; it was Mr. Stover's expectation that she be paid within 30 days. (Joint Exs. 16, 35, 39, 44, 61).

a. Bound by Settlement Agreement

I find that Elizabeth Putsche knew in 2016 that a settlement agreement had been reached and that she was bound by that agreement. (Joint Ex. 39). In a July 14, 2016 email, she wrote to Mr. Stover "**we can get what was read into the official record. That's what I agreed to-and**

---

2011); *see also Harden v. Wicomico Cty*, 263 F.R.D. 304, 308 (D. Md. 2009)(embracing view that errata sheets are to be used to correct a court reporter's errors and a deponent should not be allowed to "rewrite" his answers).

**that's it…We will hold up our half of what was agreed to**."  (*Id.*)(emphasis supplied).  She expected to be bound by the agreement.

However, as set forth below, by the time of her January 22, 2019 deposition, she had embroidered the following onto her narrative: she was bound to the agreement to the extent that the agreement was enforceable.  By the time of the evidentiary hearing, Mrs. Putsche attempted to change her testimony again.  On redirect examination by her attorney, she attempted to back away from her July 14, 2016 email that the June 2, 2016 audio recording reflected what she had agreed to, testifying that, when she wrote the email she did not know what was in the transcript of the audio recording and that she "misspoke in [the] email."  (EP Hearing Transcript, p. 126).

I further find that her narrative about mediation being non-binding gained steam in mid-late July 2016, not on June 2, 2016.  (Joint Exs. 39, 61).

I do not find Mrs. Putsche credible when she says that she did not agree to assignment of copyright of any photographs.  Nor do I find persuasive the argument that Jason Putsche/JPP photographs was not bound by the June 2, 2016 agreement.  (Joint Ex. 31).  On June 6, 2016, Mrs. Putsche contacted the U.S. Copyright Office on behalf of Jason Putsche and JPP to try to contest ACA's copyright registration of JPP photographs and to obtain registration for all photographs. (Joint Ex. 35).  A reasonable inference that I draw from her conduct and her words is that she knows that an agreement was reached related to the ownership of all photographs and she is trying to block ACA from having the rights to the photographs.  She did not want to be "bullied" by ACA. (*Id.*).

      b.  <u>Affidavit</u>

I find troubling that Mrs. Putsche has attempted to substantively change her deposition testimony, which was made under oath, by subsequently executing an affidavit.  Mrs. Putsche was

deposed on January 22, 2019.  The documents reflect that on March 22, 2019, roughly two months after his deposition--and about 20 days after ACA filed its motion for partial summary judgment--Mrs. Putsche executed an affidavit in which she attempted to provide more self-serving testimony. (ECF No. 150-18).  It made me wonder why she did not correct her testimony while being deposed, as opposed to making them twice, after having had the opportunity to review the transcript, possibly talk to her attorney and look at ACA's summary judgment pleading and reflect on the possible adverse inferences that could be drawn from the answers that she provided during her deposition.  Rather than make herself appear more credible, these actions led me to question the veracity of her testimony under oath during deposition and at the evidentiary hearing.

c.  Evasive/Non-responsive Testimony

During her January 22, 2019 deposition, there were instances where she did not answer a question directly, which struck me as problematic.  For instance, she was asked whether she agreed that her position as of September 2018 was that she was bound by the June 2, 2016 agreement, to which she replied "I'm bound to the settlement as much as it is enforceable."  (Joint Ex. 29, pp. 23-24).  When pressed further on her answer, she admitted that she was bound by the settlement:

> when it was read into the record and then hoped to set it aside. I guess it became clear it was not going to be set aside after we got the ruling [from Judge Lipman]. Yes, the entire time, from when it was spoken to when I got the ruling on the motion to set aside, I believed I was bound by the settlement as far as it was enforceable.

(Joint Ex. 29, p.25).  Next, she was asked whether, when she left Judge Lipman's courtroom on June 2, 2016, she understood that she was bound by the settlement, and the following colloquy ensued:

> Q:  Is it your testimony that when you walked out of court on June 2, 2016, you understood that you were bound by the settlement personally?

A: I had a lot of questions when I left the courtroom, which were addressed with my attorney on the phone later that day because a lot of the things that were read into the record, I had not agreed to. I spoke to my attorney for a significant amount of time during the settlement being read into the record and hadn't heard half of what was being read into the record, so I wasn't sure what I was bound to as I hadn't agreed to it. My attorney was telling me it was not legally binding, and I was not clear at the time what had been read into the record.

Q: Can you read my question back, please? (court reporter read the question)

A: I can't say what I thought at that exact time. It was a really long time ago, and a lot has happened since then.

Q: But I'm just following up on your earlier testimony, where you told me that even before the court denied your motion to set aside the verdict, you understood you were bound by a settlement agreement. That's what you just told me, right?

A: I knew there was a settlement agreement.

Q: You just didn't know what it was?

A: Correct.

Q: So you understood on June 2, 2016 you were bound by something, but you didn't know what?

A: I knew I had agreed to accept $18,000, which was a reduced amount of money, for the collections case that I was owed and that I had agreed to attend mediation. Those were the things I had agreed to.

Q: Did you come to learn that there were other obligations that you had?

A: I came to learn that there was additional things read into the settlement when I got the audio tape and the transcription.

Q: Are you disputing now today that you are bound by those other things, as well?

> A: As far as that settlement can be enforced, I am bound to that extent.
>
> Q: And you say that because, in your view, ACA didn't comply with its obligations?
>
> A: And the settlement is extremely vague, and I'm not positive all of it's enforceable.

(Joint Ex. 29, pp. 25-27).  Next, ACA's counsel attempted to question her about Judge Lipman's memorandum opinion and order, the terms of the settlement read into the record, and she did not answer his questions directly and volunteered information when no question was pending.  (*See*, *e.g.*, Joint Ex. 29, pp. 38-44).  Rather than directly answer simple questions posed to her with facts, she was often evasive, non-responsive, and she inserted her legal arguments.  (*See*, *e.g.,* Joint Ex. 29, pp. 38-41; 51-53, 58-61).

When I read the aforementioned passages and other deposition passages, I did not think that Mrs. Putsche was trying to carefully answer the questions, but, rather, it struck me that she was being evasive, non-responsive, and contradicted herself.  She came across as having a motive to fabricate.[8]

Her deposition testimony was in my mind when she appeared in front of me at the hearing. During cross examination at the evidentiary hearing, Mrs. Putsche, at times, appeared evasive, failing to answer basic questions directly, and providing answers with legal conclusions embedded in them.  She was often impeached.  (*See*, *e.g.*, EP Hearing Transcript, pp. 70-73, 91, 93, 95-96, 101-102, 104, 109-110, 119-120).

---

[8] Another example of her credibility being called into question involves her deposition testimony that the dismissal of the Copyright Action without prejudice was not read into the record on June 2, 2016 and was "added" after ACA refused to go to mediation.  (Joint Ex. 29, pp. 56-57).  Her statement is contradicted by the record.  (Joint Ex. 44, p. 11).

### C.  MR. STOVER WAS JASON PUTSCHE'S ATTORNEY ON JUNE 2, 2016 AND HAD THE AUTHORITY TO NEGOTIATE ON HIS BEHALF

When I analyze the evidence, and draw reasonable inferences therefrom, here are my factual findings and conclusions.

Previously, in Section V.B.1.a., I outlined why I find it not credible that Mr. Stover was not Mr. Putsche's attorney between June 2, 2016 and August 2016.  I incorporate those findings in this section.  This section is likely redundant.  Nonetheless, here are my additional findings.

It is uncontroverted that Mr. Stover represented Mr. Putsche regarding his dispute with ACA over unpaid invoices.  (ECF No. 150-5).  Indeed, on May 25, 2016, Mr. Putsche received a check for $950.00 from ACA to resolve his claim.  (Joint Ex.  26).  The uncontroverted evidence is that this payment arrived during the same time that Mr. Stover was in communication with Mr. Oravetz and the Putsches about a global resolution of the State Court Action and the Copyright Action.  (*See*, *e.g.*, Joint Exs. 11, 13, 25, 32, 33).  It is also undisputed that Mr. Stover represented Mrs. Putsche in the State Court Action.

I further find that the record is clear that between in or about 2014 until 2016, Mr. Stover represented the Putsches in all three of their disputes with ACA, which were going on at various overlapping points in time.  (Joint Exs. 3, 6, 8, 26; ECF No. 150-5).  Between November 2015 and May 2016, Mr. Stover had the express authority to represent Mr. & Mrs. Putsche in their settlement discussions with ACA to resolve all of their disputes, including related to the ownership of the JPP Photographs and B-Rolls.  (*See*, *e.g.*, Joint Exs. 9, 10, 11, 18, 19, 21, 22, 58).  It was quite common for Mr. Stover to discuss all three disputes with both Mr. and Mrs. Putsche.  (Joint Exs. 17, 32, 33, 35, 38, 39, 55, 56, 58; ECF No. 150-20; BRS Hearing Transcript, p. 208-212; 231).  Neither of the Putsches told him that he lacked this express authority.  Mr. & Mrs. Putsche do not argue--indeed they could not credibly do so--that Mr. Stover had not been representing them in this fashion,

regardless of whether the invoices are silent on all of the aspects of the representation. Put another way, the Putsches cannot credibly dispute that before June 2, 2016, Mr. Stover had their express authority to reject any offers of a global resolution made by ACA, as there is much evidence to establish that he had such authority. (*See, e.g.*,  Joint Ex. 1, pp. 43-64; Joint Ex.29, pp. 62-85).

Even on June 2, 2016, the Putsches cannot credibly dispute that they continued to discuss global settlement with Mr. Stover.  (Joint Exs. 1, 27, 29; JP Hearing Transcript; EP Hearing Transcript; BRS Hearing Transcript).  Thus, even if the Putsches were surprised that  the idea of a global settlement with ACA was again raised on June 2, 2016, both Putsches and Mr. Stover corroborate each other that it was discussed in the hallway.  (*Id.*).  The record does not reflect that on June 2, 2016, Mr. Putsche or Mrs. Putsche said words to the effect of "Mr. Stover. Why are we talking about copyright interests in the JPP photographs and B-Rolls? You don't represent me or JPP anymore."  There is no credible evidence that the Putsches affirmatively communicated to Mr. Stover that he was no longer empowered to represent Mr. Putsche related to the copyright/ownership of the JPP photographs and B-Rolls.  (BRS Hearing Transcript, p. 227-228).  A reasonable interpretation of their express words and conduct lead me to conclude that he had actual authority to so represent them.  *Dickenson*, *supra*, at 442; *Citizens Bank*, *supra*, at 459.

Indeed, as set forth in Section V.B.1.a., after June 2, 2016, both Putsches continued to communicate with Mr. Stover about the agreement reached on June 2, 2016.  (*See also* ECF No. 150-20; Joint Exs. 17, 39).  It makes no sense for Mr. Putsche to communicate with Mr. Stover if he does not believe that Mr. Stover still has the power/authority to represent him related to disputes about the JPP photographs and B-Rolls.

Mr. Stover's deposition and hearing testimony has been consistent.  The aforementioned emails support this fact.  He was Mr. Putsche's attorney with the express authority to negotiate

and reach an agreement related to the JPP photographs and B-Rolls.  *See Posko v. Climatic Control Corp.*, 198 Md. 578, 583, 84 A.2d 906 (1951)(agent's testimony sufficient to establish express authority).  All of this constitutes ample evidence to support that Mr. Stover had the express authority to negotiate on Mr. Putsche's behalf.  *See 4900 Park Heights Avenue, LLC v. Cromwell Retail, LLC*, 246 Md. App. 1, 23-24, 227 A.3d 757 (2020).

In sum, despite the Putsches' post 2016 attempts to convince me otherwise, I find that Mr. Stover had the express authority to represent Mr. Putsche on June 2, 2016 and that he continued to represent Mr. Putsche until August 2016.  I further find that he had the authority to negotiate and reach a global agreement.  ACA has met its burden of establishing that Mr. Stover acted with the Putsches' authority, which extended to settlement of the Copyright Action.  *4900 Park Heights Ave, LLC*, *supra*, at 23-24; *Mitchell Props*, *supra*, at 483.

### D. SPECIFIC FINDINGS AND CONCLUSIONS: EVENTS BEFORE, ON, AND AFTER JUNE 2, 2016

#### 1. *Before June 2, 2016*

In or about November 2015, ACA's counsel contacted Mr. Stover to try to resolve the outstanding disputes between it and each of the Putsches related to unpaid invoices and copyright issues related to the photographs taken by Jason Putsche/JPP Photography during the period that they were affiliated with ACA ("global resolution").  (Joint Exs. 9, 18, 19).  The vast majority of these disputed photographs were taken by Mr. Putsche and Jason Putsche Photography.  (BRS Hearing Transcript, p. 213).  If the terms were right, the parties wanted to resolve all matters and "divorce" themselves from each other.  (Joint Exs. 1, pp. 115-116; 18; 19).  No settlement was reached.  (BRS Hearing Transcript, pp. 221-224).

New counsel for ACA, Justin Oravetz, resumed settlement-related communications in March 2016, and then again in May 2016, including on May 31, 2016.  (Joint Exs. 9, 10, 11, 13,

21, 22, 25).  On March 2, 2016, ACA wanted acknowledgement from Mr. Putsche/JPP that ACA had ownership rights in JPP photographs and B-Rolls.  Again, the JPP photographs and B-Rolls were the primary focus.  (BRS Hearing Transcript, pp. 224-225).  Mr. Stover made clear that Mr. Putsche was not interested in giving up his ownership (copyright) in the JPP photographs.  (Joint Exs. 9, 10, 21, 22).  However, he did not have a problem with ACA using the JPP photographs, provided that, when it did so, ACA properly credited the work as his.  (Joint Ex. 9).

In March 2016, Mr. Stover made clear to Mr. Oravetz that the Putsches were tired of discussing settlement, as the prior efforts had gone nowhere.  (Joint Ex. 21).  Mr. Stover communicated to Mr. Oravetz that if ACA was seeking to revive discussions about ownership of copyright in JPP photographs, it was a "non-starter," and he doubted that he would ever get authority to "sell the photos."  (Joint Exs. 9, 21).

On March 10, 2016, Mr. Oravetz again broached the topic of a global settlement with Mr. Stover, floating the idea that the copyrights to the JPP photographs could be jointly registered by the parties.  (Joint Exs. 10, 22).  Mr. Stover discussed the idea of global resolution with Mr. Putsche and Mrs. Putsche.  (BRS Hearing Transcript, p. 214).  By March 2016, the primary focus remained on the JPP photographs and B-Rolls taken by Mr. Putsche, not any photographs taken by Mrs. Putsche.  (BRS Hearing  Transcript, p. 216).  The idea of joint registration shared by JPP and ACA was rejected.  (Joint Ex. 1, pp. 134-135).

On or about May 23, 2016, Mr. Oravetz again broached the idea of a global resolution via an email to Mr. Stover.  This time, he attached a redacted copy of a copyright infringement complaint that ACA intended to file in U.S. District Court-New Jersey were the parties unable to resolve the outstanding disputes related to the State Court Action and copyright of JPP photographs

and B-Rolls.  (Joint Ex. 25).[9]  In the email, ACA demanded the following to settle the case: ACA would not file the Copyright Action; a confidential settlement that contains a non-disparagement provision and mutual release; ACA would agree that the JPP, Jason Putsche and Elizabeth Putsches owned the JPP photographs and B-Rolls and ACA would withdraw or assign to the Putsches all copyright registrations; Mrs. Putsche would accept $3,000; and the State Court Action would be dismissed.  (*Id.*).  Mr. Stover sought clarification from Mr. Oravetz as to whether, per the proposed agreement, ACA would "stop using JPP's past photos altogether, or would they give a credit when they cite?"  (Joint Ex. 11).  Mr. Stover discussed this settlement proposal with Mr. Putsche and Mrs. Putsche, which they rejected.  (Joint Ex. 1, pp. 58-60).

When he walked into the courthouse the morning of June 2, 2016, Mr. Stover did not believe that he had the authority to discuss a global settlement related to the JPP photographs and B-Rolls.  (Joint Ex. 1, BRS Hearing Transcript).

In sum, I find that prior to June 2, 2016, the prospect of a global settlement had been presented to the Putsches, which they rejected.  The fact that Mr. Stover did not believe that when he waked into courthouse on June 2, 2016 that he had the authority to discuss a global settlement is not significant.  And, even assuming that before June 2, 2016 the Putsches had been unwavering in their desire not to reach a global settlement, it does not mean that they did not change their minds on June 2, 2016.  I do not find logical the argument that because a person has said "no" previously, that means that the person could never change his mind in the future.  My focus is on whether a reasonable inference can be drawn from the evidence to conclude that a global settlement was reached on June 2, 2016.

---

[9] By this time, Jason Putsche's Breach of Contract Action had been virtually resolved; his payment would arrive approximately 2 days later.  (Joint Ex. 26)

It is worth noting that several of the terms that are reflected in the notes, audio recording, and transcript for June 2, 2016 had been broached before that day.  (Joint Exs. 11, 16, 25, 43, 44).  Thus, some of these terms were not new to the Putsches on June 2, 2016.

2. *June 2, 2016*

a. Global Settlement Idea Resurfaces

It is undisputed that on June 2, 2016, Mrs. Putsche, Mr. Putsche, Mr. Stover, and Mrs. Putsche's parents were in Judge Lipman's courtroom when the State Court Action was called for trial.  (Joint Exs. 1, 27, 29).  Judge Lipman invited Mr. Stover and Mr. Oravetz into his chambers.  (Joint Exs. 43, 44).  During that meeting, the attorneys discussed with Judge Lipman the most recent efforts to reach a global resolution, and told Judge Lipman that ACA had filed the Copyright Action.  The attorneys then left Judge Lipman's chambers.  (Joint Ex. 1, pp. 73-75; BRS Hearing Transcript, p. 234).

b. Hallway Negotiations

The Putsches divide what happened in the hallway thereafter into "pauses" in the proceedings: "first pause" and "second pause."  ACA does not dispute that there were two different phases.  For simplicity's sake, I will call these breaks "pauses."

After the attorneys left Judge Lipman's chambers, Mr. Stover walked with Mr. Putsche and Mrs. Putsche out of the courtroom and into the hallway.  He told them that ACA was interested in resolving the State Court Action and the Copyright Action.  (Joint Ex. 1, pp. 75-76; Joint Ex. 27, pp. 27-29; Joint Ex. 29, p. 92).  Mr. Putsche, Mrs. Putsche, and Mr. Stover all agree that Mr. Putsche and Mrs. Putsche actively participated in the "first pause," during which the idea of global settlement was discussed.  (Joint Ex. 1, pp.78-81; Joint Ex. 27, pp. 27-37; Joint Ex. 29, p. 92; EP Hearing Transcript, p.36; BRS Hearing Transcript, pp. 235-236).  Mr. Putsche was not surprised

that the topic of global settlement came up again; he was not "blindsided" by it being raised.  (Joint Ex. 27, pp. 26-29).  He understood that ACA was seeking a global resolution related to **his** photographs.  (*Id.*)(emphasis supplied).  During the first pause, both of the Putsches told Mr. Stover that they did not want to discuss a resolution involving JPP photographs. (Joint Ex. 1, pp. 146-147; Joint Ex. 27, pp.27-29).

This first pause lasted between forty-five minutes to an hour or as long as two hours.  (Joint Ex. 29, p. 94; EP Hearing Transcript, p. 36; BRS Hearing Transcript, pp. 235-236).

The "first pause" ended when Judge Lipman's bailiff summoned the attorneys back to Judge Lipman's chambers.  (BRS Hearing Transcript, pp. 236-237).  They were there briefly, and then Mr. Oravetz, Mr. Stover, Mrs. Putsche and Mr. Putsche returned to the courtroom.  Judge Lipman went back on the record.  He stated that he understood that the parties were close to resolving Mrs. Putsche's case, but what was "hanging it up" was the Copyright Action.  (Joint Exs. 43, 44; BRS Hearing Transcript, p. 238).  Judge Lipman encouraged everyone to explore a global resolution of the State Court Action and the Copyright Action.  If not, he was prepared to try the State Court Action.  (Joint Ex. 27, pp. 30-35; Joint Ex. 29, pp. 95-96; Joint Ex. 43; Joint Ex. 44, p. 5; BRS Hearing Transcript, pp. 237-238; JP Hearing Transcript, pp. 176-177; EP Hearing Transcript, pp. 40, 88-89).

Mr. Putsche, Mrs. Putsche, and Mr. Stover returned to the hallway and had further discussions about a possible global resolution ("second pause").  (Joint Ex. 1, pp. 87-88; Joint Ex. 27, pp. 32-37; EP Hearing Transcript, pp. 40-41, 89-90; BRS Hearing Transcript, pp.239-243).  Because the issues related to Mrs. Putsche's State Court Action had been largely resolved during the first pause, the second pause was dedicated mostly to the disputes related to JPP photographs and B-Rolls.  (Joint Ex. 1, p. 96; Joint Ex. 44, p. 5; EP Hearing Transcript, p. 90).

This "second pause" lasted between thirty minutes to forty-five minutes.  (Joint Ex. 1, pp. 95-96; BRS Hearing Transcript, p. 240).  The "second pause" was marked by "shuttle diplomacy," whereby Mr. Stover walked back and forth between where Mr. Oravetz was standing and where Mr. and Mrs. Putsche were located at the other part of the hallway.   Mr. Stover discussed the copyright-related issues with Mr. Putsche and Mrs. Putsche.  (Joint Ex. 1, pp. 90-92; Joint Ex. 27, pp. 36-37; BRS Hearing Transcript, pp. 240-241).   The Putsches did not tell Mr. Stover that he was not authorized to discuss resolution related to the photographs.  (Joint Ex. 1, pp. 92-93; BRS Hearing Transcript, p. 241).

At some point, while Mr. Stover and the Putsches were discussing the copyright issues, Mrs. Putsche's brother and parents  joined the group.  (EP Hearing Transcript, p. 40; BRS Hearing Transcript, p. 241).   After Mr. Oravetz saw them together, he threatened to call Mrs. Putsche's relatives as witnesses, so they left the courthouse.  (EP Hearing Transcript, pp. 40-41; BRS Hearing Transcript, p. 242).  Mr. Putsche did not leave right away.  (EP Hearing Transcript, p. 41; BRS Hearing Transcript, p. 242).

I find credible Mr. Stover's testimony that Mr. Putsche was there for some period of time and that a settlement was reached during that time related to the JPP photographs and B-Rolls.  (Joint Ex. 1, pp. 156-157; BRS Hearing Transcript, p. 243).  I do not find the Putsches credible when they testified about Mr. Putsche's presence or absence during this second phase.  I make this finding because of the many ways that they contradicted themselves and each other when testifying about the "first pause" and "second pause," examples of which I have set forth in Section V.D.2.iii.

There is no dispute that as part of the negotiations in the hallway Jason Oravetz wrote notes.  Mr. Stover reviewed the notes and wrote some words onto the notes, which he handed to Mr. Oravetz after discussing with the Putsches.  (Joint Ex. 1, pp. 182-184; Joint Ex. 16; BRS Hearing

Transcript, pp. 244-247).  I further find Mr. Stover credible when he says that he discussed the notes with the Putsches, which were to be read into the record.  (Joint Ex. 1, pp. 182-183; BRS Hearing Transcript, pp. 244-247).  He did not testify that he showed them the notes.  I do not find either of the Putsches credible when they have stated that Mr. Stover did not discuss the notes with them.  (*See* ECF Nos. 150-7, 150-18).  As I found, *supra*, the circumstances under which they chose to execute affidavits after being deposed to assert this so-called fact make me find them not credible.

Mr. Putsche left the courthouse before the agreement was read into the record.  (Joint Ex. 1, p. 154; BRS Hearing Transcript, p. 247).  It is immaterial for my purposes that Jason Putsche was not a party to the State Court Action, nor that he was absent when the agreement was read into the record.  As I have held, the facts support that there was an agreement to which Mr. Putsche assented.

### c. The Putsches' Conflicting Testimony on the Hallway Negotiations

I do not find the Putsches' testimony as to what transpired in the hallway to be fully credible because they contradicted themselves, or one person's testimony contradicted the other person's testimony.  Here are just a few examples.

Mr. Putsche's January 2019 deposition testimony contradicts Mrs. Putsche's January 2019 deposition testimony as to what happened during the "second pause" in the June 2, 2016 court proceedings.  In January 2019, Mr. Putsche testified that he was an "active participant of that conversation for a very short amount of time," while Mrs. Putsche testified that her husband was not there during that "second pause."   (Joint Ex. 27, pp. 32-38; Joint Ex. 29, pp. 107-109).  However, during direct and on cross examination at the evidentiary hearing, Mrs. Putsche said that her husband was present for at least some part of the "second pause," including when discussions

were occurring related to a global settlement.  (EP Hearing Transcript, pp. 40-41, 89-90).  In addition, during direct examination at the evidentiary hearing, Mr. Putsche backtracked from his January 2019 testimony, testifying that he was "playing on his phone," was disengaged, and was not really paying attention to the substance of the hallway discussions ("first pause" and "second pause").  (JP Hearing Transcript, pp. 139-141).

Next, at his deposition, Mr. Putsche testified that he went out into the hallway a third time, where he was joined by his wife, Mrs. Putsche's parents, her brother, and Mr. Stover.  They engaged in a conversation.  During that time, Mr. Oravetz called Mr. Stover away from the group to talk to him.  Mr. Stover returned to the group and told them that Mr. Oravetz had threatened to call Mrs. Putsches' parents as witnesses because they had been talking about matters and may have waived attorney-client privilege.  It was after that point that Mr. Stover and Mrs. Putsche agreed that he, her parents, and her brother should leave the courthouse.  (Joint Ex. 27, pp. 38-40).  During the evidentiary hearing, Mrs. Putsche said that the aforementioned occurred during the second pause in the hallway, not the third.  (EP Hearing Transcript, pp. 40-41).

Also, during the hearing, Mrs. Putsche did not readily admit to facts that her husband had conceded were true.  For instance, she was asked whether her husband participated in the discussions where ACA was interested in resolving the State Court Action and Copyright dispute, and she did not answer directly at first, saying her husband "was in the hallway."  Only after being asked again, did she admit that her husband participated and expressed his opinion.  (EP Hearing Transcript, pp. 86-87).  Also, during the hearing, Mrs. Putsche testified that in the hallway on June 2, 2016 a decision was made that assignment and ownership of the head shots would be discussed during mediation, however, during her deposition she claimed that this topic never came up, as she did not own the photographs.  (EP Hearing Transcript pp. 100-102; Joint Ex. 29, pp. 126-127).

39

d. <u>Agreement Read into the Record</u>

Based on my review and analysis of the evidence, and reasonable inferences drawn therefrom, I find that during that day, there was more than sufficient time for the Putsches, Mr. Stover, and ACA to discuss and agree to  global settlement terms.  (Joint Ex. 1, pp. 95-96; Joint Ex. 29, p. 94; EP Hearing Transcript, p. 36; BRS Hearing Transcript, pp. 235-236, 240).  I find that the parties mutually assented to the terms.  (*See, e.g.*, Joint Exs. 1, 16, 17, 39, 43, 44; ECF No. 150-20; Defendant's Impeachment Ex. 3; BRS Hearing Transcript).  I find that there was consideration.  (Joint Exs. 16, 43, 44).

I further find that the material terms of this agreement were read into the record before the trial judge presiding over the State Court Action.  These are the settlement terms:

(1) ACA pays Mrs. Putsche $18,000;
(2) The Putsches would have all ownership rights in the honeymoon photos;
(3) ACA would have ownership rights in all head shot photos containing ACA personnel (without cats);
(4) The remaining photos would be divided by the parties to the agreement in a draft-style process, with selections being at the rate of 1000 photographs/per round until ACA's cap was reached;
(5) ACA's cap would be determined by the mediator at mediation, during which the parties would try to agree on the cap percentage;  If the parties could not agree on a cap, the mediator would decide. If the percentage could not be negotiated, it would be 25% of the remaining photographs;
(6) If there was a dispute about what constituted the pool or remaining photos, or what was a head shot or what was a honeymoon photograph, that would be decided at mediation;[10]
(7) After mediation, the parties would have 10 days to select the first 1,000 photographs, starting first with the Putsches and then ACA would select 1000 photographs in 10 days, etc., until ACA's cap was reached. Failure to select constituted waiver;
(8) The parties jointly own the B-Rolls;
(9) The settlement was confidential;
(10) Mutual non-disparagement;
(11) The parties were to exchange their respective lists of all photographs taken by JPP within 30 days;

---

[10] *See* my finding that I do not believe that the parties agreed that if there were a dispute about what constituted the remaining photographs, the mediator's conclusion would be binding.

(12)   The Putsches agreed not to sell or publish any photograph containing ACA and a cat unless ACA personnel was cut out. This provision did not apply to Mrs. Putsche while employed by ACA;

(13)   Mutual release of claims;

(14)   ACA agreed to dismiss the Copyright Action without prejudice until the mediation occurred, after which time the dismissal would revert to with prejudice; and

(15)   All claims/counterclaims of the State Court Action would be with prejudice.

(Joint Exs. 16, 43, 44).

Giving effect to the parties' intentions, I find that here was an offer and acceptance by the parties, and a meeting of the minds on the terms that the parties thought were material **on that day**.  (Joint Exs. 1, 16, 17, 43, 44; BRS Hearing Transcript).  I further find that a reasonably prudent person would have understood that the agreement reached on June 2, 2016 required the following: (1) ACA would pay Mrs. Putsche $18,000 and Mrs. Putsche would dismiss her claim and ACA would dismiss the counterclaim; (2) the Putsches would have ownership of the honeymoon photographs and ACA would own the headshot photographs with ACA personnel (no cats); (3) mediation would occur, during which if there were any dispute about what constitutes the batch of remaining photographs, or what was a head shot or any honeymoon photo, this would be decided during mediation; (4) there would be a draft-style photograph selection process during mediation, with ACA's cap decided by the mediator; (5) dismissal of the Copyright Action would be without prejudice until after mediation, when the parties expected to resolve all issues related to the remaining photos; (6) joint ownership of the B-Rolls; (7) within 30 days of June 2, 2016, the parties were to exchange their lists of photographs taken by JPP; (8) confidentiality; (9) a mutual release; and (10) mutual non-disparagement.

In addition, I find that the words "binding" or "non-binding" mediation are not reflected in the handwritten notes from June 2, nor in the transcript that memorialized the agreement reached. (Joint Exs. 16, 44). However, I find that a reasonable inference to be drawn from the credible

evidence is that all parties intended to be done with each other after mediation. They intended to be bound by their agreement. (*See, e.g.*, EP Hearing Transcript, p. 121). That is why they agreed to dismissal, why no appeal was filed, and why they partially performed on the contract by exchanging lists/images of photographs.

I also find that both sides mutually agreed that all issues related to the "remaining photos" would be resolved during mediation, and that no one on June 2, 2016 thought that they needed to be more specific than that. I further find that a reasonably prudent person in the Putsches' position or in ACA's position would conclude that "remaining photos" excludes honeymoon photos and headshots with ACA, which leaves photographs taken by JPP and Elizabeth Putsche.

I further find that there was **not** an agreement that the mediator would make a binding decision as to what, e.g., was a head shot. I do not find credible evidence to support this. However, everyone agreed to resolve issues related to all photographs during mediation. (*See, e.g.,* Joint Exs. 16, 43, 44, 61; Joint Ex. 29, pp. 116-117; EP Hearing Transcript, pp. 40, 90-96).

Regarding the number of photographs, the handwritten notes reflect the number 15,000 written at the top, and some long division computation, which results roughly in the number 33% (.66). (Joint Ex. 16). The rest of the notes include numbers associated with the draft selection process. (*Id.*).

I do not find credible the argument that Elizabeth Putsche thought mediation would only involve her photographs. (Joint Exs. 29, pp. 116-117, 126-128; Joint Ex. 31). The record is clear that in the draft-style selection process that the parties agreed to each turn (round) involved selecting 1000 photographs. This process would have to include JPP photographs, because Mrs. Putsche only had copyrights in approximately 2,000 photographs. (Joint Ex. 48; Defendant's Impeachment Ex. 3).

In addition, the Putsches' November 2016 submission to ACA included the list of JPP photographs and Mrs. Putsche's own photographs, minus the honeymoon photographs and headshots, establishes their understanding that these "remaining photos" were subject to mediation. (Defendant's Impeachment Ex. 3). If in 2016 the Putsches truly did not believe that they had agreed to resolve disputes related to the ownership of the JPP photographs, then why would they partially perform on the contract by sending a list of the JPP photographs to ACA in November 2016? Their partial performance is the Putsches' acknowledgment that there was sufficient meeting of the minds on June 2, 2016 as to what was required of them.

I further find that a reasonable inference to be drawn from the credible evidence is that Mrs. Putsche believed on June 2, 2016 that she possessed the authority to attend mediation to discuss the remaining photos which, by definition, had to include the JPP photographs and her photographs. I also find that Mrs. Putsche believed that she was authorized to act on her husband's behalf to discuss copyright issues, as she had done before June 2, 2016 and she continued to do after June 2, 2016. (Joint Exs. 32. 35, 39, 61). Her testimony at the hearing that she did not possess the authority to act on his behalf related to the photos, (EP Hearing Transcript, pp. 21-22), is her *post hoc* attempt to create a narrative that it simply belied by the email traffic in 2016.

In addition, I do not think that on June 2, 2016 anyone was focused on the date that Mrs. Putsche would be paid $18,000, nor do I believe Mrs. Putsche that being paid within 30 days of June 2 was on her mind. I do not find that the parties discussed a date certain, and I find that, after June 2, 2016 the idea that payment 30 days later was a standard occurrence came from Mr. Stover. (Joint Exs. 35, 39, 61).

Mrs. Putsche's statement that she was whispering for most of the time that Mr. Oravetz was speaking into the record is not supported by the audio recording. (Joint Ex. 43). During the

evidentiary hearing, on redirect examination, Mrs. Putsche tried to say that the audio recording of the June 2, 2016 proceeding that was played for me was of an inferior quality than the audio recording that she listened to, as you could not hear her talking to her attorney from the moment that the settlement terms were being read into the record.  (EP Hearing Transcript, pp. 123-124). I listened to the audio recording that the parties provided to me and do not hear her whispering, and the transcript reflects one time that she interrupted her attorney.  (Joint Ex. 44).

In addition, on July 14, 2016, before her deposition testimony and before her evidentiary hearing testimony, she said that she agreed to whatever was read into the official record.  (Joint Ex. 39).  This was before Mr. Stover suggested how the Putsches could undo the settlement, (Joint Ex. 17), and before Mrs. Putsche authorized Kathryn Goldman to file a motion to set aside the settlement agreement, in which she made different arguments as to why the agreement was invalid. (Joint Ex. 31).  I further find that Mrs. Putsche starts further refining her narrative **after** listening to the audio recording and **after** ACA sent the written agreement on July 11, 2016.  (*See*, *e.g.*, Joint Exs. 39, 61).

The Putsches and Mr. Stover corroborate each other when they testified that on the evening of June 2, 2016, the Putsches called Mr. Stover.  (Joint Exs. 1, 27, 29).  I find credible Mr. Stover's testimony that during that conversation the Putsches regretted their decision.  (ECF No. 150-20, p.3).  The Putsches wanted to get out of the agreement that they had reached.  (Joint Ex. 1, pp, 110-112).  During that conversation, they agreed that the next step was to wait for a check from ACA and schedule mediation.  (Joint Ex. 35; Joint Ex. 29, pp.139-141).

### 3.  *Conduct After June 2, 2016*

There is no evidence before me that the parties interacted during the thirty days following the hearing, and so I infer that no one performed on any part of the agreement during that time.

On or about July 5, 2016, roughly 30 days after June 2, 2016, ACA had not paid Mrs. Putsche $18,000 and the discussions began about whether ACA was in breach of the agreement. (Joint Ex. 35). On or about July 11, 2016, ACA emailed a draft written agreement to Mr. Stover, which included terms not agreed to on June 2, 2016, including a possible mechanism for defining "remaining photos." (Joint Ex. 38). There is no credible evidence before July 2016 that the Putsches or ACA thought that how to more particularly define "remaining photos" was material to them. Based on the evidence, I find that July 2016 is when the parties began to manifest their concern **to each other** about certain aspects of what they had agreed to. This does not mean that there was no meeting of the minds on June 2, 2016.

Neither party exchanged their list of all photographs taken by JPP within 30 days of the settlement. Rather, it was not until the Fall of 2016 that the parties started performing on the contract. After Judge Lipman denied the motion to vacate the agreement, Katherine Goldman sent photographic images to ACA's counsel, and ACA's counsel sent images to Kathryn Goldman. (Defendant's Impeachment Ex. 3, ECF No. 150-25). Ultimately, each party received consideration or were to receive consideration, had everyone followed through: $18,000 payment and dismissal of the Copyright Action occurred (Putsches); ownership rights to the honeymoon photographs (Putsches); joint ownership of the B-Rolls; ACA would own certain headshots with ACA personnel; and, upon completion of mediation, each side would own some portion of the remaining photographs.

## VI. CONCLUSION

As set forth herein, I find that Bradley Stover had the express authority to represent Jason Putsche on June 2, 2016 and to enter into an agreement on his behalf related to all images that belonged to Jason Putsche/JPP and Mrs. Putsche. I also find that Elizabeth Putsche, Jason Putsche

and ACA had a meeting of the minds and formed a contract on June 2, 2016 as to what they defined on that date as the essential terms.  This global agreement resolved all contract and copyright-related disputes between the parties.

By November 2016 and December 2016, the parties began partially performing on the agreement formed on June 2, 2016.

The  terms of the contract are as set forth in Section V.D.2.iii.

The Letter Order also issued today notifies the parties that they have fourteen (14) days in which to file objections to this Report and Recommendations pursuant to Fed. R. Civ. P. 72(b) and Local Rule 301.5b.

Dated:  March 13, 2023                         _____/s/_____
                                               The Honorable Gina L. Simms
                                               United States Magistrate Judge