IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| JASON PUTSCHE, | * |
| Plaintiff, | * |
| v. | *   Civ. No. DLB-17-255 |
| ALLEY CAT ALLIES, INC., | * |
| Defendant. | * |

* * * * * * * * * * * *

| | |
|---|---|
| ALLEY CAT ALLIES, INC., | * |
| Third-Party Plaintiff, | * |
| v. | * |
| ELIZABETH PUTSCHE, *et al.*, | * |
| Third-Party Defendants. | * |

**MEMORANDUM OPINION**

On January 27, 2017, photographer Jason Putsche ("Jason") filed a complaint against Alley Cat Allies, Inc. ("ACA") seeking a declaration that he is the sole owner of a set of cat photos and videos he took for ACA. ECF 1. ACA filed a counterclaim and third-party complaint alleging that Jason, his spouse and former ACA employee Elizabeth Putsche ("Elizabeth"), and their business, Jason Putsche Photography ("JPP"), were in breach of a June 2, 2016 settlement agreement resolving this dispute. ECF 7. The parties filed cross-motions for partial summary judgment on the counts involving the settlement agreement. ECF 144 & 150. The Court denied both motions, ECF 159, and referred this matter to Magistrate Judge Gina L. Simms to hold an evidentiary hearing and prepare a Report and Recommendations concerning the enforceability of the settlement agreement, ECF 160.

Judge Simms held an evidentiary hearing on June 11, 2021. ECF 185. Jason, Elizabeth, and their former attorney Bradley Stover testified at the hearing. On March 13, 2023, Judge Simms issued her Report and Recommendations ("the Report"). ECF 192. Judge Simms found that Jason, Elizabeth, and JPP ("the Putsches") and ACA entered into a settlement agreement on June 2, 2016. The Putsches timely objected to certain elements of the Report. ECF 196. ACA responded. ECF 202. In accordance with Fed. R. Civ. P. 72(b), the Court has reviewed the Report and the complete record and makes a de novo determination on the matter. No hearing is necessary. *See* Loc. R. 105.6. The Court determines the Putsches' objections lack merit and adopts the Report.[1]

## I. Standard of Review

The Magistrate Judges Act, 28 U.S.C. § 636, authorizes a district court to designate a magistrate judge to conduct a hearing and report proposed findings of fact and recommendations for action on a dispositive motion. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); *United States v. Raddatz*, 447 U.S. 667, 673–74 (1980). A party that disagrees with a magistrate judge's report and recommendation as to a dispositive motion must file "specific written objections" within 14 days. Fed. R. Civ. P. 72(b)(2). Then the district court must "determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3). However, the Court "need only conduct a *de novo* review of those portions of the Magistrate Judge's Report and Recommendation to which objection is made." *Chavis v. Smith,* 834 F. Supp. 153, 154 (D. Md. 1993). "As to those portions of the report for which there is no objection, the district court 'must only satisfy itself that there is no clear error on the face of the record in order

---

[1] The Court dispenses with a formal recitation of the background of this case, which may be found in the Report. *See, e.g.*, *Warns v. Comm'r, Soc. Sec.*, No. CCB-17-1307, 2018 WL 3973076 (D. Md. Aug. 3, 2018) (adopting report and recommendation without providing complete background); *Carey v. Comm'r, Soc. Sec.*, No. ELH-13-684, 2014 WL 2878556 (D. Md. June 23, 2014) (same).

2

to accept the recommendation.'" *Balt. Line Handling Co. v. Brophy*, 771 F. Supp. 2d 531, 534–35 (D. Md. 2011) (quoting *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315–16 (4th Cir. 2005)).

## II.   Objections

The Putsches make four objections to the Report. *See* ECF 196, at 1–2, 32–33. They dispute Judge Simms's finding that Stover had the authority to make the settlement agreement on behalf of Jason and JPP. They challenge her finding that there was a meeting of the minds between Jason and JPP on one hand and ACA on the other on the material terms of the settlement. They reject her statement that if the terms of the settlement were what Elizabeth claims, there would not have been consideration. And they contest Judge Simms's findings about their credibility and Stover's. After reviewing the record de novo, including the transcript of the evidentiary hearing and the extensive documentary evidence, the Court finds the Putsches' objections are meritless and adopts the Report.

### A.   Settlement Authority

The Putsches object to the Report's finding that Stover had the authority to enter into an agreement on their behalf. Under the applicable law—the law of Maryland—"the party seeking to enforce a settlement order must prove: (1) that the other party's counsel acted with the authority of his client; and (2) that such authority expressly extended to the settlement of the claim." *Mitchell Props., Inc. v. Real Estate Title Co.*, 490 A.2d 271, 276 (Md. App. Ct. 1985).[2] Whether an attorney

---

[2] The Putsches correctly note that the Report did not identify whether the standard of proof for this claim under Maryland law is preponderance of the evidence or clear and convincing evidence. *See* ECF 196, at 4 n.2. It does not appear that Maryland courts have ruled on this question directly. Nevertheless, the appropriate standard seems to be preponderance of the evidence. Under Maryland law, "the burden of proof of express authority of an attorney to compromise a claim rests upon the party asserting such authority. This is so because the attorney-client relationship is governed by the law of agency and the issue of burden of proof must be determined by agency

3

had the express authority to settle a claim is a question of fact. *Scamardella v. Illiano*, 727 A.2d 421, 425 (Md. App. Ct. 1999). A court may find that an attorney had the authority to settle a claim if the client's "written or spoken words or other conduct" can reasonably be interpreted to mean that the client authorized the attorney to act on their behalf. *See Dickerson v. Longoria*, 995 A.2d 721, 735 (Md. 2010).

### 1. Authority to Discuss and Authority to Settle

The Putsches' first argument is that Judge Simms erred in finding that Jason authorized Stover to *settle* his claims based on evidence that Jason authorized Stover to *discuss* settling his claims. The Putsches have a point: The authority to discuss a settlement is not the authority to reach a settlement. *Cf. Mitchell Props.*, 490 A.2d at 276 (explaining that while "there is a *prima facie* presumption in Maryland" that an attorney may act on behalf of their client, Maryland "has declined to extend that presumption to the settlement of a lawsuit" so an attorney "must have express authority to settle their clients' claims"). Evidence of the former alone might not suffice to establish the latter. But Judge Simms did not conflate the two. Instead, Judge Simms recognized that evidence Stover had the authority to discuss settlement modestly supported the claim that he had the authority to reach a settlement. She was correct to give this evidence that limited role.

---

principles." *Kinkaid v. Cessna*, 430 A.2d 88, 90–91 (Md. App. Ct. 1981). Under agency principles, the existence and scope of an agency relationship "is always a fact to be proved" to the jury. *Fertitta v. Herndon*, 3 A.2d 502, 503–04 (Md. 1939). The standard of proof for jury findings of fact in Maryland civil litigation in general, and on a breach of contract claim in particular, is preponderance of the evidence. *See Wills v. State*, 620 A.2d 295, 296 n.1 (Md. 1993) (citing *Edwards v. State*, 83 A.2d 578 (Md. 1951)) (preponderance is the standard of proof in civil litigation generally); *Collins/Snoops Assocs. v. CJF, LLC*, 988 A.2d 49, 57–59 (Md. App. Ct. 2010) (preponderance is the standard of proof in breach of contract actions). Therefore, under Maryland law, the standard of proof for establishing that an attorney had the power to settle a case for their client is preponderance of the evidence. In any event, the Court need not decide that question because ACA has met either standard.

Despite what the Putsches suggest, the primary evidence Judge Simms relied on in support of her finding that both Putsches expressly authorized Stover to reach a settlement on the terms entered into the record on June 2, 2016 is Stover's testimony to that fact and the emails contemporaneous to the formation of that agreement. *See* ECF 192, at 16 (citing "Joint Exs. 1, 16, 17, 27, 29, 35, 39, 43, 44, 61; ECF No. 150-20; Defendant's Impeachment Ex. 3; and BRS Hearing Transcript"); *see also id.* at 31–32 (finding based on Stover's "deposition and hearing testimony" that Stover "was Mr. Putsche's attorney with the express authority to negotiate and reach an agreement related to the JPP photographs and B-Rolls"). Stover's testimony is clear: During the negotiations in the hallway during the second pause in the judicial proceedings, both Putsches empowered him to strike the deal that was read into the record. *See, e.g.*, ECF 189, at 246–47 ("Q: Did [the Putsches] authorize you to go read those notes into the record with Mr. Oravetz? A: They did."); *id.* at 250 ("Q: And had they authorized you to present those terms to the Court? A: Yes. Q: Both Mr. and Mrs. Putsche? A: That's correct."). That evidence was enough to sustain the finding that the Putsches expressly authorized Stover to settle their claims.

2.  **Burden Shifting**

The Putsches' second argument is that Judge Simms incorrectly assigned them the burden of proof by demanding that they prove they stripped Stover of authority to settle, rather than demanding that ACA prove they granted Stover authority to settle. Judge Simms did not. As the Court discussed in the previous paragraph, Judge Simms's finding that the Putsches expressly authorized Stover to settle rested on Stover's testimony, the contemporaneous emails, and other evidence in the record. True, as the Putsches point out, Judge Simms noted that on June 2, Jason did not tell Stover that he did not have settlement authority. *See* ECF 192, at 23. From Jason's silence, Judge Simms inferred that Jason thought Stover still represented him on June 2. *Id*. This

5

inference appears in a section of the Report evaluating the Putsches' claim that Jason terminated Stover as his attorney on or about May 26, 2016. *See id.* at 22–23. Only after citing evidence that Jason continued to act as though Stover was his attorney in the ensuing weeks—including by participating in the settlement negotiations on June 2—did Judge Simms mention that Jason did not tell Stover that he was no longer his attorney. *See id.* Her point was not that Jason's silence on Stover's settlement authority meant Stover had settlement authority by default, until and unless the Putsches divested him of it. Her point was that Jason's conduct (seeking legal advice from Stover and corresponding about litigation strategy) combined with his failure to expressly end the attorney–client relationship together indicate "that Mr. Putsche thought that Mr. Stover still represented him on June 2, 2016." *Id.* at 23. On this understanding of the Report, the Court rejects this argument.

### 3. The Emails

The Putsches' third argument is that Judge Simms erred "by failing to consider" a few emails they believe undermine ACA's claim that Stover had settlement authority. *See* ECF 196, at 8. The Putsches cannot sincerely dispute that Judge Simms *considered* the evidence of interest to them. All of the materials they cite appear on the list of evidence she reviewed. *Compare* ECF 192, at 6–7, *with* ECF 196, at 8–12. Instead, the Putsches believe that Judge Simms did not interpret this evidence the way they would have liked or give it the weight that they believe it deserves. Their arguments are unconvincing.

Their primary concern is that in the emails Stover exchanged with the Putsches in the weeks after the hearing, Stover did not explicitly mention the handwritten notes he and ACA's attorney, Justin Oravetz, took on the terms of the settlement. To the Putsches, that reveals that Stover's testimony that they authorized him to make the deal on June 2 was not credible—and that

Elizabeth's testimony that they did not authorize him was credible. For example, in a July email exchange after ACA sent over its draft agreement, Elizabeth wrote to Stover, "No to joint ownership of B Rolls (which were not even discussed)." *See* ECF 191-17, at 1. Stover responded, "Was definitely discussed. I recall it elicited a shoulder shrug from you guys." *Id.* As the Putsches see it, this exchange reveals that Stover never reviewed the notes with them before the agreement was entered into the record. If Stover had discussed the notes with them in the hallway on June 2, they say, he would have mentioned the notes in this email. But he did not. So, they conclude, his testimony was false and Elizabeth's contrary testimony was true.

Nothing warrants that leap.

If anything, this exchange reinforces Stover's credibility and undermines Elizabeth's. The handwritten notes mention joint ownership of the B-rolls. ECF 191-6, at 2. The settlement agreement read into the record included that term too. ECF 191-5, at 7. So the only contemporaneous evidence buttresses what Stover wrote (and later testified) and belies what Elizabeth wrote (and later testified). Ironically, Elizabeth wrote in this same exchange, "We can get what was read into the official record. That's what I agreed to." ECF 191-17, at 1. Within six weeks of the settlement agreement, Elizabeth had started to mistake terms she did not like with terms to which she did not agree.

Undaunted, the Putsches try to make even more of this email exchange. On their account, these emails reveal "what Mr. Stover really meant when he testified at the hearing that Mr. and Mrs. Putsche 'consented' to the settlement": "his idea of 'consent' . . . was a shoulder shrug." ECF 196, at 9. This assertion distorts the testimony and evidence. The "shoulder shrug" that Mr. Stover recalled in this brief email was in response to a single term in the on-the-record settlement

7

agreement. Stover never testified that he believed the Putsches authorized him to enter into a settlement agreement because they shrugged their shoulders. *See id.*

In addition, the Putsches argue that if Jason had agreed to the terms of the settlement in the hallway on June 2, Stover would have said so when Elizabeth asked how Jason could be "held to a settlement in which his name never appears in [sic] and he was not present for." ECF 196, at 11 (citing JE-35, at 1, ¶ 1). But there is plenty of evidence that Stover tried telling the Putsches—Jason included—that they had agreed to the settlement. For example, prior to the email just quoted, Elizabeth informed Stover that Jason was writing to the Copyright Office to object to ACA's registration of the photos he took. ECF 144-4, at 73. In response, Stover wrote that Jason's objection "shows clear intent to not comport with the terms of the settlement agreement" but that if "you guys don't want to comply with the agreement," that was "your call." *Id.* at 72. And after the email the Putsches cite, Stover tried to explain to them that "when we appeared in court on June 2nd, we moved beyond legal and factual debates on both topics [Jason's copyrights and Elizabeth's contractual rights] by entering into a settlement agreement, on the record, in front of a judge." *Id.* at 79. He said: "They promised payment. We promised dismissal. Both sides promised mediation as to copyrights. They promised dismissal of the federal suit." *Id.* Stover insisted that "it was clear that payment on the Elizabeth claim was tied to mediation of Jason's photograph claim." *Id.* at 80. The record shows that Stover attempted to explain that Jason had agreed to the settlement.

In any case, Elizabeth's question rested on a false premise. Jason's name *was* part of the settlement read into the record and several provisions addressed the rights and responsibilities of "the Putsches," plural. *See* ECF 191-5, at 6 ("Plaintiff owns and Alley Cat Allies will assign all ownership rights in all honeymoon photos with the photos taken by Jason (inaudible) Putsche

8

Photography for Alley Cat Allies –"; "After mediation, the parties will have then ten days to make their selection of 1000 – their round selection of 1000 photos. So, for example, the Putsches are first, so they'll select 1000 photos in ten days."); *id.* at 7 ("The Putsches agree not to sell or publish any photo with an Alley Cat Allies personnel in it and a cat unless the Alley Cat Allies personnel is cut out, cropped out or otherwise not in the photo."). Nothing the Putsches have said in this section of their brief provides any reason to reject Stover's testimony that the Putsches authorized him to agree to the settlement.

### 4. Jason's Absence from the Courtroom

Their final argument is that Judge Simms erroneously dismissed as immaterial Jason Putsche's absence from the courtroom when the settlement agreement was read into the record and the fact that he was not a party to the state court action. His absence, the Putsches insist, "spoke louder than any words." ECF 196, at 12. Read in context, Judge Simms's finding that Jason's absence was immaterial was not erroneous. In the paragraphs before the sentence the Putsches challenge, Judge Simms found—chiefly on the basis of Stover's hearing testimony—that the Putsches agreed to the terms of the settlement in the hallway during the second pause. *See* ECF 192, at 37–38. She also found that the Putsches' statements to the contrary were not credible, particularly in light of the ways they had contradicted one another and themselves on this topic over the course of the litigation. *See id.* If, as Judge Simms correctly found, that is what transpired in the hallway, then of course it was immaterial that Jason left the courthouse rather than hear the settlement read into the record. He knew what it said, and he had agreed to its terms. His absence from the courtroom does not vitiate his express agreement to the settlement mere minutes before. Nor does his decision to leave the courthouse before the settlement terms were read into the record constitute decisive evidence that he never agreed to the settlement. There was evidence that

9

Elizabeth took the lead on their legal matters. Stover testified that Jason was typically less engaged in their legal discussions than Elizabeth. *See* ECF 189, at 246 ("As was usually the case with Mr. and Mrs. Putsche, Mrs. Putsche did most of the talking."). Their correspondence shows the same. *See, e.g.*, ECF 144-4, at 66–77. Even when the topic was Jason's rights to his own photos, it was Elizabeth who did virtually all of the writing. *See id.* It also was immaterial that Jason was not a party to the state court action. Jason did not have to be in court that day with Elizabeth, but he came anyway. While he was there, he joined her in striking a global settlement that would resolve their disputes with ACA. That is what matters.

Judge Simms correctly found that ACA carried its burden of proving that the Putsches expressly authorized Stover to reach the settlement agreement on the terms memorialized on the record on June 2. The Court adopts that finding.

### B. Mutual Assent

Second, the Putsches object to the finding that there was mutual assent to the material terms of the settlement agreement between Jason and ACA. Under Maryland law, a settlement agreement is evaluated like a contract. *See Mitchell Props.*, 490 A.2d at 276; *O'Brien & Gere Eng'rs, Inc. v. City of Salisbury*, 135 A.3d 473, 489 (Md. 2016) (citing *Clark v. Elza*, 406 A.2d 922 (Md. 1979)). "[A] manifestation of mutual assent is an essential prerequisite to the creation or formation of a contract." *Falls Garden Condo. Ass'n v. Falls Homeowners Ass'n*, 107 A.3d 1183, 1189 (Md. 2015) (quoting *Cochran v. Norkunas*, 919 A.2d 700, 708 (Md. 2007)). Mutual assent is a function of two variables: "(1) intent to be bound, and (2) definiteness of terms." *Id.* at 1190 (quoting *Cochran*, 919 A.2d at 708). In evaluating the terms of a contract, Maryland courts follow the objective theory of contractual interpretation. *O'Brien & Gere*, 135 A.3d at 489. Under the objective theory, "[i]f a contract is unambiguous, the court must give effect to its plain meaning

10

and not contemplate what the parties may have subjectively intended by certain terms at the time of formation." *Nova Rsch., Inc. v. Penske Truck Leasing Co.*, 952 A.2d 275, 283 (Md. 2008) (citing *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 929 A.2d 932, 952 (Md. 2007)). When interpreting a contract's terms, courts must "look to the entire language of the agreement, not merely a portion thereof[,]" and must "consider the customary, ordinary and accepted meaning of the language used." *Id.* Courts also should consider "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 488 A.2d 486, 488 (Md. 1985).[3]

The Putsches' arguments that there was not a meeting of the minds between Jason and ACA on the material terms of the agreement do not hold up to scrutiny. First, the Putsches emphasize that the handwritten notes on the hallway negotiations do not mention Jason or his business. From that fact, the Putsches conclude that "the actual words of the putative agreement" support Jason's position that even if ACA thought the agreement bound Jason and covered his

---

[3] The Putsches assert that the five factors identified in *Cochran v. Norkunas*, 919 A.2d 700 (Md. 2007)—"(1) the language of the preliminary agreement, (2) the existence of open terms, (3) whether partial performance has occurred, (4) the context of the negotiations, and (5) the custom of such transactions, such as whether a standard form contract is widely used in similar transactions," *id.* at 708—determine whether the parties intended to be bound to the settlement agreement read into the record. *See* ECF 196, at 14. However, those factors bear on intent to be bound in a different context: when a court must determine whether parties intended to be bound to some preliminary document (like a letter of intent) rather than a subsequent formal, written contract. *See Cochran*, 919 A.2d at 708–11. True, in *4900 Park Heights Ave. LLC v. Cromwell Retail 1, LLC*, 227 A.3d 757 (Md. App. Ct. 2020), the Maryland Appellate Court applied the *Cochran* factors to a dispute about the enforceability of a settlement agreement read into the record during a judicial proceeding. *Id.* at 772–74. But the court applied the factors there because one party was arguing that the agreement read into the record was a preliminary agreement preceding a written settlement agreement, such that the parties did not intend to be bound to what they read into the record. *Id.* at 772. Here, no party argues that the settlement agreement read into the record was merely a preliminary accord to be formalized by a written agreement later. As a result, the *Cochran* factors do not appear to be relevant. Even if the *Cochran* factors were relevant here, however, they would still support ACA's position, for the reasons described in this section.

11

photos, Jason did not. ECF 196, at 15. Not so. For one thing, the notes are not the agreement itself. The notes are notes. The agreement is the bargain the parties struck in the hallway, which then was read into the record. And the terms read into the record mention Jason and identify rights and responsibilities of the Putsches. *See* ECF 191-5, at 6–7. For another, even if the notes were the agreement—which, again, they are not—they contain terms that can only reasonably be construed as covering Jason. For instance, they refer to an exchange of 5000 photos with ACA, ECF 191-6, at 1—yet Elizabeth alone did not have more than 2000 photos at issue, *see* ECF 191-20. And they cover ACA's responsibility to dismiss the federal case, ECF 191-6, at 2—that is, the case against Jason. Of course, Judge Simms did not find that there was a meeting of the minds based on these notes alone. This Court does not either. But the Putsches' argument that the notes are evidence that there was no meeting of the minds between Jason and ACA is unsound.

Second, the Putsches argue that Jason never partially performed any term in the handwritten notes and that this putative fact supports the conclusion that there was no mutuality of assent between him and ACA. This inference is unsound. As the correspondence between the Putsches and Stover indicates, the Putsches decided not to perform because they regretted making the agreement and because they did not trust ACA would follow through on its end of the bargain—not because Jason did not intend to bind himself on June 2 or because the terms were too indefinite. *See, e.g.*, ECF 191-15, at 1. Even if Jason did not partially perform any term in the handwritten notes in the weeks after the settlement agreement was read into the record, there still was mutual assent on June 2.[4]

---

[4] Although this Court does not rely on evidence of partial performance to determine that there was mutual assent, the record supports Judge Simms's finding that the Putsches partially performed. *See* ECF 192, at 43. On November 18, 2016, attorney Kathryn Miller Goldman sent ACA's attorney the first list of photographs for the draft in compliance with the terms of the settlement agreement. *See* ECF 191-20, at 1. The list featured "photographs taken by Jason Putsche

Next, the Putsches rehash their argument that Jason never agreed to the settlement at all, drawing on well-worn facts like his departure from court before the agreement was read into the record. The Court already has rejected these arguments. In this section of their brief, the Putsches do not make any novel points about this evidence that go to mutual assent in particular.

Finally, the Putsches argue that material differences between the June 2 settlement agreement and the July ACA draft agreement evince a lack of mutual assent. The Putsches misrepresent the evidence. For example, they claim that the agreement read into the record does not mention Jason Putsche Photography. In fact, it does. ECF 191-5, at 6. They claim that according to the handwritten notes and the transcript, ACA was limited to 25 percent of the remaining photos. In fact, the notes provide that ACA's share will be capped at a percentage greater than or equal to 25 percent, written as "Cap ≥ 25%," ECF 191-6, at 1, and the agreement read into the record provides that ACA's share will be determined at mediation but that if mediation on this point fails, it will be 25 percent, ECF 191-5, at 6.

Despite these inaccuracies, the Putsches identify some genuine material differences between the June 2 agreement and ACA's July draft. For example, the July ACA draft agreement provided that ACA would pay the Putsches the $18,000 only after ACA had received its share of

---

Photography." *Id.* The copyrights were "owned by Jason Putsche, individually, not Elizabeth Putsche and not Jason Putsche Photography." *Id.* Since Elizabeth had no authority of her own to transfer these photographs or the rights to them to ACA, the letter indicates that Goldman was performing on Jason's behalf. Jason confirmed that interpretation in a roughly contemporaneous letter. *See* ECF 189, at 191–93. In August 2016, he wrote to his insurer to make a claim for his legal fees. *Id.* at 191. He wrote, "Brad Stover is no longer representing us. We have a new Maryland attorney, Kathryn Goldman, who is representing us in the collections case," *id.* at 193— that is, the case in which the settlement agreement was entered, *see id.* at 16–17. And at his deposition, Jason testified that Goldman represented him and Elizabeth in this phase of the litigation. *See id.* at 190. Perhaps unsurprisingly, Jason testified at the hearing before Judge Simms that he had been "mistaken" when he said that at the deposition. *See id.* Judge Simms found that statement not credible, and for good reason in light of the other evidence. In sum, it appears that Judge Simms correctly concluded that Jason had partially performed on the agreement.

the JPP photographs. *See* JE-41, at 5; *see also* ECF 191-17, at 1. That condition of payment was not part of the June 2 agreement. *See* ECF 191-5, at 6. Further, the July ACA draft agreement provided that in the event of a dispute about the remaining photos, the mediator would have the final, binding word. *See* ECF 191-17, at 1. That term was not part of the June 2 agreement either. *See* ECF 191-5, at 7.

The problem for the Putsches is that these discrepancies are irrelevant as a matter of law. Stated simply, the Putsches are asking the Court to find that there was no mutual assent on June 2 because ACA subjectively believed the June 2 agreement meant what ACA's July draft later said, even where they conflict or where the term ACA had in mind did not appear in the June 2 agreement. *See* ECF 196, at 17. That is not how mutual assent analysis works. As the Putsches themselves emphasize, *see id.* at 14, the words of the agreement are the most important evidence of the parties' intent to be bound and the terms to which they intended to be bound, *see Cochran*, 919 A.2d at 709. The words are interpreted objectively, not subjectively. *See Nova Rsch.*, 952 A.2d at 283. "If the language of a contract is unambiguous, we . . . *do not contemplate what the parties may have subjectively intended* by certain terms at the time of formation." *Id.* (emphasis added). For that reason, even if ACA subjectively thought that the June 2 agreement meant what the July draft agreement subsequently said, that alone would not undermine the mutuality of the parties' assent on June 2. ACA's subjective interpretation of the settlement would only jeopardize the mutuality of assent if the June 2 agreement was materially ambiguous.

However, as the Report concluded correctly, the June 2 agreement was not materially ambiguous. *See, e.g.*, ECF 192, at 17, 19–20. In fact, even though the Putsches once maintained that some terms were ambiguous, *see* ECF 189, at 118, the Putsches have not made that argument in their objections to the Report. Because the June 2 agreement was not objectively ambiguous—

14

as the Putsches implicitly concede—the Court must reject the Putsches' argument about ACA's subjective intent. It is not enough for the Putsches to show that ACA thought the agreement meant one thing and the Putsches thought that it meant another. *See* ECF 196, at 17. "A contract is not ambiguous merely because the parties do not agree as to its meaning." *Phoenix Servs. Ltd. P'ship v. Johns Hopkins Hosp.*, 892 A.2d 1185, 1223 (Md. 2006).

In sum, because ACA's subjective interpretation of the unambiguous agreement is legally irrelevant, the Court rejects the Putsches' argument that the July draft agreement shows that there was not mutual assent to the June 2 agreement.

### C. Consideration

The next "finding" to which the Putsches object is that if Elizabeth's understanding of the settlement agreement were correct, "ACA would receive no consideration for its promise to dismiss the Copyright Action. ACA would pay her $18,000 but receive nothing in return: no ability to avoid future litigation; no final resolution of all copyright disputes." *See* ECF 192, at 19. There is consideration if "a performance or a return promise [is] bargained for," and "[a] performance is bargained for if it is sought by the promisor in exchange for his . . . promise and is given by the promisee in exchange for that promise." *Pettiford v. Next Generation Tr. Serv.*, 226 A.3d 15, 27 (Md. 2020) (quoting *Chernick v. Chernick*, 610 A.2d 770, 774 (Md. 1992)). The Putsches contend that even on Elizabeth's understanding of the contract, ACA would have received consideration: ACA paid out only $18,000 on a claim for $23,000 and Elizabeth dismissed the state court action with prejudice. *See* ECF 196, at 32–33.

Zoom out from this "finding," however, and it becomes clear that it is not a finding at all, but rather an argument in support of a finding that Elizabeth's testimony about her understanding of the agreement was not credible. Here is the context:

15

> I do not credit Mrs. Putsche's testimony that she could accept ACA's payment of $18,000 and attend non-binding mediation to discuss only her photographs, (see, e.g., Joint Ex. 31). First, Mrs. Putsche transferred her rights/ownership of her photographs to her husband in 2015. (Joint Ex. 36). Second, Mrs. Putsche's interpretation is of a unilateral arrangement not borne out by the facts, and is an arrangement under which ACA would receive no consideration for its promise to dismiss the Copyright Action. ACA would pay her $18,000 but receive nothing in return: no ability to avoid future litigation; no final resolution of all copyright disputes.

*See* ECF 192, at 19. In this passage, Judge Simms identifies two grounds for finding Elizabeth not credible on this point: Elizabeth transferred her ownership rights in the photographs to her husband years earlier and her interpretation is "not borne out by the facts." Those facts include that Elizabeth's position does not reflect the terms in the handwritten notes taken on June 2. It does not reflect the terms read into the record that day. And it does not reflect the terms Stover testified the parties accepted. In consequence, the Court accepts Judge Simms's finding about the credibility of Elizabeth's interpretation without regard to Judge Simms's argument that there would not have been consideration for the agreement as Elizabeth claims to have understood it. The Court does not read the statements that perturb the Putsches as making a hypothetical finding about whether there would have been consideration if the settlement agreement had been a certain way. This purported finding appears nowhere else in the Report and is immaterial.

### D. Credibility

After reviewing the record before her and observing the live testimony of the Putsches and Stover, Judge Simms found that Stover was credible (with one caveat immaterial here) and that the Putsches were so incredible that it would have been proper to disregard their testimony entirely. *See* ECF 192, at 20–22. The Putsches challenge these credibility findings.

If a party objects to a magistrate judge's credibility findings, the district court must review those findings de novo. *See United States v. Raddatz*, 447 U.S. 667, 673–74 (1980). However, if a

16

magistrate judge makes a credibility finding based on live testimony and that finding is supported by the record as a whole, including the transcript of the testimony, then the district court should give significant deference to that finding. *See United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005); *Cullen v. United States*, 194 F.3d 401, 407 (2d Cir. 1999); *Hill v. Beyer*, 62 F.3d 474, 482 (3d Cir. 1995); *United States v. Michaels*, No. 5:19-cr-31, 2019 WL 6974756, at *3 (N.D. W.Va. Dec. 20, 2019) ("A magistrate judge's credibility determinations based on live testimony are entitled to deference where they are supported by the record as a whole."); *Jackson v. United States*, Nos. 5:07-CR-110-FL-1, 5:12-CV-205-FL, 2014 WL 7149635, at *3 (E.D.N.C. Dec. 15, 2014) ("A reviewing court must take a deferential standard regarding the credibility of witnesses where the magistrate judge sits as a trier of fact."). In fact, the district court should not discard a credibility finding based on live testimony unless the court conducts a new evidentiary hearing. *See Gibbs*, 421 F.3d at 357; *United States v. Ridgway*, 300 F.3d 1153, 1157 (9th Cir. 2002); *United States v. Cofield*, 272 F.3d 1303, 1305–06 (11th Cir. 2001); *Cullen*, 194 F.3d at 407; *Hill*, 62 F.3d at 482; *see also United States v. Johnson*, 107 F. App'x 322, 331–32 (4th Cir. 2004) (Duncan, J., dissenting) (observing that the circuit courts that have considered this question are aligned); *Raddatz*, 447 U.S. at 681 n.7 (warning that for a district court to "reject a magistrate's proposed findings on credibility when those findings are dispositive and substitute the judge's own appraisal . . . without seeing and hearing the witness or witnesses whose credibility is in question could well give rise to serious questions"). Ultimately, of course, the district court must exercise its "non-delegable authority" to determine whether to adopt the magistrate judge's findings. *See Wimmer v. Cook*, 774 F.2d 68, 76 (4th Cir. 1985).

After reviewing the transcript and the rest of the evidence, the Court determines that Judge Simms's credibility findings are supported by the record as a whole. Consider each finding to

17

which the Putsches object. First, the record supports Judge Simms's finding that Stover was sufficiently disinterested that his testimony need not be discarded or discounted as self-interested. *See* ECF 192, at 21. Unlike the Putsches, Stover is not a party to this case. While the resolution may bear on his professional reputation, there is no support in the record for the Putsches' insinuation that he distorted his testimony to avoid malpractice liability for his conduct on June 2. *See* ECF 196, at 19–20. Ironically, the record shows that Stover himself first advised the Putsches to "throw me under the bus" by retaining new counsel and claiming that Stover had not had the authority to settle the case. *See* ECF 144-3, at 102. That self-effacing advice is not what one would expect from someone so desperate to avoid harm to his reputation that he would lie to protect it.

Second, Judge Simms's conclusions about Stover's consistency are supported as well. Any inconsistency about whether the second pause lasted 30 minutes or 45 minutes was immaterial because the parties were not starting from scratch. They had been developing the basic contours of an agreement for months. *See, e.g.*, ECF 191-3; ECF 191-4. And the handwritten notes—which even the Putsches acknowledge were produced during the pause, *see* ECF 196, at 22—show that no matter how long the pause lasted, it lasted long enough for the parties to develop the settlement agreement. *See* ECF 191-6. Despite the Putsches' arguments to the contrary, Stover's testimony about the scope of his negotiating authority was not materially inconsistent: There is no contradiction between his hearing testimony that he was authorized to *discuss* the copyright issue with counsel for ACA between November 2015 and June 2, 2016 and his deposition testimony that he was not authorized to *settle* that dispute until later on June 2. Nor is there any material inconsistency between Stover's deposition testimony about Elizabeth's whispering during the June 2 proceedings and his hearing testimony. The Putsches may take issue with his decision not to pause the proceedings to double check that he and his client were aligned. But they have not

identified any material inconsistency between his statements about what took place. Additionally, Judge Simms acknowledged Stover's inconsistency on the question of whether the settlement agreement empowered the mediator to make binding decisions if certain disputes arose about the classification of the photos at issue. ECF 192, at 20–21. Judge Simms did not blithely accept his testimony at face value.

Finally, for the reasons discussed in the prior sections of this opinion, Stover's testimony that the Putsches had authorized him to make the settlement agreement is supported by the record. So Judge Simms's determination that this testimony was credible is supported as well.[5]

Judge Simms's finding that the Putsches were not credible is similarly supported by the record. She recounts that at the hearing, "Mrs. Putsche, at times, appeared evasive, failing to answer basic questions directly, and providing answers with legal conclusions embedded in them." ECF 192, at 29. She observes, accurately, that Elizabeth "was often impeached." *Id.* Drawing extensively from the record, Judge Simms identifies additional instances in which Elizabeth gave unresponsive or evasive answers, documents how the claims of both Putsches have materially shifted over time, details their attempts to revise their testimony after the fact to better serve their interests, and identifies ways in which their testimony was unsupported or even undermined by the documentary evidence. *See id.* at 22–29. The Putsches quibble with some of the details, but their objections do not threaten Judge Simms's credibility determinations. Upon reviewing the record with fresh eyes, the Court finds that Judge Simms had ample reason to conclude that the

---

[5] The Putsches also object to the Report's assertion that "Over the life of this case, ACA's arguments have remained relatively consistent when trying to establish that the June 2, 2016 Settlement Agreement was valid." ECF 196, at 28. That is not a finding about the credibility of a witness at all. In any case, this remark is immaterial to Judge Simms's findings.

Putsches were not credible. Because Judge Simms's credibility findings are supported by the record, the Court defers to them.

Even if Judge Simms's credibility findings were not entitled to deference, the Court would accept her material findings—that Stover credibly testified that the Putsches had authorized him to reach the binding settlement agreement read into the record in the June 2 proceeding and that the Putsches' conflicting testimony was not reliable—after reviewing the record de novo, for the reasons discussed throughout this opinion.

Judge Simms's credibility findings are adopted in full.

### III. Conclusion

After reviewing the record de novo, the Court finds that the Putsches' objections are meritless and adopts the Report, ECF 192, as an Order of the Court. The parties are directed to meet and confer on next steps and submit a joint status report by April 12, 2024 that states their respective positions on how this seven-year-old case should proceed and conclude. A status call is scheduled for April 19, 2024 at 10:00 a.m. Chambers will circulate the call information. A separate order follows.

Date: March 20, 2024

Deborah L. Boardman
United States District Judge